Brian W. LaCorte (012237)
lacorteb@ballardspahr.com
Kimberly A. Warshawsky (022083)
warshawskyk@ballardspahr.com
Jonathon A. Talcott (030155)
talcottj@ballardspahr.com
BALLARD SPAHR LLP
1 East Washington Street, Suite 2300
Phoenix, AZ 85004-2555
Telephone: 602.798.5400
Facsimile: 602.798.5595

*Attorneys for Plaintiff GoDaddy.com, LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GoDaddy.com, LLC<br><br>Plaintiff,<br><br>vs.<br><br>RPost Communications; RMail; and RPost Holdings,<br><br>Defendants. | No.CV-14-00126-PHX-JAT<br><br>**GODADDY.COM, LLC'S MOTION TO PRECLUDE TESTIMONY OF DEFENDANTS' DAMAGES EXPERT GREGORY SMITH REDACTED**<br><br>**(Oral Argument Requested)** |

Defendant GoDaddy.com, Inc. ("GoDaddy") respectfully moves the Court to exclude Defendants' ("RPost") damages expert, Gregory Smith ("Smith"), because (1) Smith inappropriately accounted for non-infringing features in his royalty rate analysis rather than through apportioning the royalty base, and (2) he applied the entire market value rule without demonstrating that the patented features form the basis of consumer demand as required by binding Federal Circuit precedent.

### **MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

GoDaddy seeks to exclude Smith's opinion on damages because binding Federal Circuit precedent clearly rejects his approach of apportioning non-infringing features of the Accused Products[1] by lowering the applicable royalty *rate*, as opposed to accounting

---

[1] The "Accused Products" in this case are GoDaddy's Express Email Marketing ("EEM"), GoDaddy Email Marketing ("GEM") products and the MadMimi email

for those features in apportioning the royalty base to which the rate applies.  As Smith clearly did not apportion the royalty base, in effect, he applied the judicially-criticized, entire market value rule ("EMVR") without providing any evidence proving that the Patented Features[2] form the basis of consumer demand. Damages may be assessed in patent cases by either (i) the lost profits method, which evaluates the patent owner's lost income from the alleged infringement, or (ii) applying a reasonable royalty rate to a royalty base.[3]  Smith chose the latter approach.  After determining a royalty rate using the hypothetical negotiation method, Smith applied the rate to a royalty base consisting of the Accused Products' *entire* net revenue stream without apportioning that base (the entirety of revenues) to account for non-infringing features.  This is the quintessential EMVR approach.[4]  However, for the patentee to be entitled to application of the EMVR, the patentee must at the outset prove the patented feature creates the *basis for consumer demand*.[5]  Otherwise, a products' entire market value and revenues may not be used to assess damages.  Smith did not meet this prerequisite.

## II.  BACKGROUND

### A.  Smith's Use of the Entire GoDaddy Revenue Base for the Accused Products and his Development of a Reasonable Royalty

In his report, Smith assumes a *redacted* % running royalty of net revenues for the Feldbau Patent and a *redacted* % running royalty rate of net revenues for the Tomkow Patents.[6]  Smith applied the running royalty to the Accused Products' *total net revenues*.[7] For the Feldbau Patent, Smith concludes the royalty rate should be "less than *redacted* %

---

marketing product ("MadMimi").

[2] "Patented Features" refers to the authentication of email content and transmission for the Feldbau Patent, on the one hand, and email tracking and reporting for the Tomkow Patents, on the other. GoDaddy disagrees that the Tomkow Patents represent one-singular feature to be accounted for with one royalty rate. GoDaddy's damages expert rejected this approach because the Tomkow Patents were issued at different times and are alleged to practice distinct features of the Accused Product. Exhibit 1, Excerpts from December 15, 2015 Report of David Perry ("Perry Report") at p. 34, Sec. 2.5.2.2.
[3] *See Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).
[4] *See Lucent*, 580 F.3d at 1336.
[5] *Id.*
[6] Exhibit 2, December 1, 2015 Supplemental Report of Gregory E. Smith ("Smith Report") at ¶ 89 and ¶ 95.
[7] Smith Report at ¶ 97.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, Arizona 85004-2555

of [GoDaddy's] reported operating margin, or **redacted** % of net sales."[8] However, Smith fails to specify the method he employs to reach these numbers. Rather, he simply discusses the following information in the abstract, without indicating how or whether it actually affected his calculations: (i) Authentix (Mr. Feldbau's company and former owner of the Feldbau Patent that proposed a license to RPost) was under financial distress at the time of the hypothetical negotiations; (ii) Mr. Feldbau's alleged preference for a running royalty; and (iii) Authetnix's demand (rejected by RPost) for a **redacted** % royalty rate.[9] He also concludes the Feldbau Patented feature was "clearly important" to GoDaddy, since GoDaddy marketed the same feature and it is one of nine other high-level selling points listed in a marketing document.[10] Then, without explaining the role of these numbers, Smith states in a vacuum that GoDaddy's operating margins were **redacted** at the time of the hypothetical negotiation.[11] He then abruptly concludes the royalty rate should be **redacted** % of *all* net sales.[12] Without further explanation, he ultimately arrives at **redacted** % for the Feldbau reasonable royalty by apparently dividing the Authentix original demand **redacted** adjustment from his other two percentages.[13]

During his deposition, Smith stated that a **redacted** % rate accounted for the Feldbau Patent's apportioned value in the Accused Products.[14] He apparently reaches this **redacted** % figure solely based on an inference from the "authentication" feature's inclusion on a list of GoDaddy's nine selling points in a single marketing document for GEM.[15]

During his deposition, the only elaboration he could provide as to how he

---

[8] Smith Report at ¶ 89.
[9] *Id*. at ¶ 87. Mr. Feldbau made these points to Smith in a phone call, on which Smith heavily relies.
[10] Smith Report ¶ 88; *see* Exhibit 3, GD00006096 (Exhibit 21 to Gilbert Dep.).
[11] *Id*. at ¶ 89.
[12] *Id*.
[13] *Id*. at ¶ 89; Exhibit 4, Excerpts from January 19, 2016 Deposition of Gregory E. Smith ("Smith Tr.") at 224:1-4.
[14] Smith Tr. at 224:5-19.
[15] Smith Report ¶ 88. Smith does not establish a link between the feature being listed as "one of nine selling points" to his conclusion that it "should be the less than **redacted** %," especially as one-ninth equals *more* than **redacted** %.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, Arizona 85004-2555

allegedly apportioned for non-infringing features of the Accused Products was that he:

> [D]etermined that based on the marketing of the features . . . that less than *redacted* % of those reported margins should be attributed to this patent . . . more than *redacted* should be attributed to the other features of the product. Since the margins were in the *redacted* % range, less than *redacted* %, **I adjusted it [the royalty rate] downward to *redacted* %**, which is half of the running royalty that Authentix was looking for . . . .  So that means *redacted* % would be *redacted* %. I said it **should be something less than that and I went with half of the *redacted* % [rate] that Authentix was looking for**.[16]

This was the sum total of Smith's supposed apportionment for the non-infringing components, even though he mentions "apportionment" nowhere in his report.[17]

For the Tomkow Patents, Smith concludes that a reasonably royalty rate for all five Tomkow Patents was *redacted* % of GoDaddy's *entire* net revenue stream for the Accused Products.  As with the Feldbau rate, Smith provides little to no explanation of his methodology for arriving at *redacted* %.[18]  He reviewed RPost's cost of licensing the Tomkow Patents by evaluating the following information: GoDaddy's profit margin of *redacted* on average and *redacted* at the time of hypothetical negotiations; RPost's targeted penetration of the relevant market was *redacted* %, with an operating margin of "about *redacted*."[19]  Smith then inexplicably applied RPost's targeted market net revenue percentages to conclude that *redacted* % of GoDaddy's net revenues are the cost to license the patents; however, with no explanation, Smith abruptly concludes "RPost's expected costs of licensing would actually equate to a royalty greater than *redacted* % of net sales," with a *redacted*.[20]  Smith also argues that the patented features are "essential" to the Accused Products because GoDaddy marketing official, Eric Gilbert, testified that the accused features are "useful" and that GoDaddy's marketing materials "prominently" display this feature.

---

[16] Smith Tr. at 223:17-22, 224:1-4 (emphasis added).
[17] Smith Tr. at 224:10-16.
[18] Smith Report at ¶ 95. Smith simply states: "Given the essential nature of these features and the cost to RPost of licensing its patents . . . . it is my opinion that a reasonably royalty for the portfolio of the Tomkow Patents . . . . is *redacted* % of net revenue."
[19] *Id.* at ¶ 91.  Smith relied on Mr. Zafar Khan's self-serving beliefs and RPost's business plans and financing memorandum containing financial projections.
[20] *Id.* at ¶ 91.

Smith ultimately asserts that "given the essential nature of these features and the cost to RPost of licensing its patents… a reasonable royalty… is *redacted* % of net revenue."[21]  Smith never explains how he reached *redacted* % from this analysis.[22]

Again, in an effort to explain some type of apportionment, Smith testified circularly that "if we could apportion *redacted* % of the value to really three things, that leaves us with the *redacted* % that's related to the patented features."[23]  On the other hand, in his report, Smith states in a footnote that he "[left] over *redacted* % of [GoDaddy's] incremental margins to cover the contributions of the non-patented elements of the services."[24]  In other words, Smith starts by picking *redacted* % as the royalty rate, then decides that somehow *redacted* % or more of revenue accounts for the non-patented features, but then applies the *redacted* % rate to GoDaddy's *entire* revenue stream associated with the Accused Products.  Unlike for the Feldbau Patent, Smith does not even attempt any downward adjustment against his *redacted* % starting point for the Tomkow royalty rate.[25]

To be clear, Smith simply applies these rates to the entire net revenues from the Accused Products, using GoDaddy's entire revenue stream from these products as the royalty base.[26]  In so doing, Smith provides no evidence that the allegedly infringing components created the primary basis for customer demand.  To the contrary, he never even mentions the phrase "consumer demand" in his report.[27] He uses no survey or consumer evidence and ignores other consumer evidence in the record pointing to consumer demands for *other non-infringing* features. Against this backdrop, his entire premise is his bare statement that the Patented Features are "clearly important" and "essential."[28]

In sum, Smith uses a royalty base that encompasses the entire net revenue stream

---

[21] Smith Report at ¶ 95.
[22] *See id*. at ¶¶ 90-96.
[23] Smith Tr. at 226:10-14.
[24] Smith Report at p. 33, fn. 84.
[25] *See id*. at ¶¶ 90-96.
[26] *Id*. at ¶97.
[27] Smith Tr. at 222:2-4.
[28] Smith Report at ¶¶ 88, 93.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, Arizona 85004-2555

of the Accused Products.[29] Without saying so, Smith's approach quintessentially applies the EMVR without proving the fundamental prerequisites concerning consumer demand for the allegedly infringing features. Smith uses a royalty rate adjustment to account for non-infringing features in an apparent act of apportionment. The Federal Circuit rejects this methodology on both counts.

### III. STANDARD FOR THE ADMISSIBILITY OF EXPERT TESTIMONY

Unqualified or unreliable opinions cannot reach the jury. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 595, 113 S. Ct. 2786 (1993). Expert testimony may be excluded on one of three grounds: (1) the expert is not qualified to testify about the subject matter, (2) the testimony will not assist the trier of fact on a relevant issue, or (3) the testimony is unreliable. *See* Fed. R. Evid. 702; *Daubert*, 509 U.S. at 595. The Court acts as a gatekeeper to determine that any expert evidence not only meets the standards of Federal Rule of Evidence 702, but is also both relevant and reliable.[30]

Expert testimony is relevant if it will serve to aid the trier of fact in evaluating contested issues at trial.[31] An expert's testimony is "inadmissible if it is based on suppositions rather than facts."[32] Thus when expert testimony is not sufficiently founded on facts, it should be excluded.[33] Indeed, the Supreme Court has warned against accepting expert testimony that is *ipse dixit* (because I said so).[34]

To assess the reliability of a proffered expert's testimony, a district court's inquiry under *Daubert* must focus, not on the "correctness of the expert's conclusions, but the soundness of his methodology."[35] Expert testimony may be considered reliable if: (1) the testimony is based on sufficient facts or data; (2) the expert's technique or methodology in reaching the conclusion is considered reliable; and (3) the expert has

---

[29] *Id.* at ¶ 96.
[30] *See Wagner v. Cty. of Maricopa*, 673 F.3d 977, 982 (9th Cir. 2012).
[31] *See id.*; Fed. R. Evid. 702.
[32] 4 WEINSTEIN'S FEDERAL EVIDENCE § 702.05[2][b]; *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).
[33] *See, e.g., Guidroz-Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 830 (9th Cir. 2001).
[34] *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997); *see also City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).
[35] *See Barabin v. AstenJohnson, Inc.*, 700 F.3d 428, 431 (9th Cir. 2012) (internal quotes omitted).

applied the methodology reliably to the facts of the case.[36]

The proponent of the expert opinion has the burden of establishing that the testimony is admissible by a preponderance of the evidence.[37] In patent infringement actions, regional circuit law controls the Court's analysis.[38]

## IV. ARGUMENT

### A. Smith's Testimony Should Be Excluded Under Rule 702 As Unreliable.

Smith's opinions are unreliable under Rule 702 for two main reasons: (1) he claimed to apportion for non-infringing features through his royalty rate rather than the royalty base, and (2) he improperly applied the EMVR by encompassing the Accused Products' entire net revenue in the royalty base, without demonstrating the patented features form the basis for consumer demand.

#### 1. Smith Inappropriately Apportioned the Royalty Rate, Rather than the Royalty Base, to Account for Non-Infringing Features.

Fundamentally, a patentee must apportion the accused infringer's profits or revenue to account for only the infringing features because "calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product."[39] The evidence establishing the apportioned value "must be reliable and tangible, and not conjectural or speculative."[40] The apportionment principle requires the royalty base to account for revenue associated only with the infringing components; this principle cannot be replaced by a method of simply applying a lower royalty rate to a product's entire market value.[41] A "mere downward adjustment" in the royalty rate that is applied to the total net revenues

---

[36] *See Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010).
[37] *See id.* at 52.
[38] *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc*., 265 F.3d 1294, 1308 (Fed. Cir. 2001) ("Evidentiary rulings . . . are not unique to our jurisdiction and, accordingly, we review them under the law of the [regional circuit].").
[39] *LaserDynamics, Inc. v. Quanta Comput., Inc*., 694 F.3d 51, 67-8 (Fed. Cir. 2012) (further clarifying *Lucent* holding that "any case involving multi-component products, patentees may not calculate damages based on sales of the entire product, as opposed to the smallest salable patent practicing unit.").
[40] *See id*. (citing *Garretson v. Clark*,111 U.S. 120, 121, 4 S. Ct. 291, 291 (1884).
[41] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320 (Fed. Cir. 2011) (clarifying *Lucent Techs.,*by disapproving the use of the entire market value for a royalty base if the patentee applies a low royalty rate.).

DMWEST #13914094 v1  7

is not sufficient to account for non-infringing features.[42]

In *Uniloc*, the Federal Circuit stated "the Supreme Court and this court's precedents do not allow consideration of the entire market value of accused products" for products with multiple consumer-demanding components by applying a low royalty rate.[43] The Federal Circuit expressly rejected patentee's argument that it could apply a low enough royalty rate to the entire revenue of the accused product without first establishing that the accused elements are the basis of consumer demand.[44] In *LaserDynamics*, the expert similarly attempted to apportion the value of the patented feature within the royalty rate by determining the patented feature was worth one-third of the product, so he divided his original royalty rate by one-third and applied the "apportioned" rate to the product's entire revenues.[45] However, this apportionment did not save the expert's opinion from exclusion on the basis that he, *by definition*, applied the entire market value rule.[46]

Here, just like the rejected expert opinions in *Uniloc* and *LaserDynamics*, Smith improperly apportioned the *royalty rate* and not the *royalty base* when accounting (if at all) for non-infringing components. Smith's rate apportionment is the archetypically impermissible "downward adjustment" of the royalty rate to make the ultimate damages figure seem like it is accounting for non-infringing features, when it actually does not. The law on this point is crystal clear. For his opinion to be reliable, Smith needed to either apportion the royalty base to reflect revenue associated only with the patented features, or prove that the entire market value rule applies. Smith did neither.

Smith apparently did consider some adjustment relating to the Feldbau Patent with an "adjustment downward" of the royalty rate by merely dividing the ***redacted*** %

---

[42] *See Mirror Worlds, LLC v. Apple, Inc.*, 784 F. Supp. 2d 703, 727 (E.D. Tex. 2011) (holding that it is inappropriate to apply a "mere downward adjustment of the royalty rate in a purported effort to reflect the relative value of the accused features because doing so fails to remove the revenues associated with the non-accused features from the revenue base.").
[43] *Uniloc*, 632 F.3d at 1320.
[44] *See id*. at 1319-20.
[45] *See LaserDynamics, Inc.*, 694 F.3d at 69.
[46] *See id*.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, Arizona 85004-2555

1  (Authentix's original demand) in half to end up at *redacted* %.  But then Smith applied
2  this rate to all of the Accused Products' net revenue, despite observing that *redacted* % of
3  the Accused Products' features do not infringe.  Similar to *LaserDynamics*, where the
4  expert plucked the one-third apportionment out of thin air as he "offered no credible
5  economic analysis to support that conclusion," Smith never justified why he applied a
6  reduction from *redacted* % to *redacted* % in the Feldbau rate or why he did not apply the
7  "adjustment" to the numbers that supposedly "apportioned" for the Feldbau Patented
8  Feature.[47]

Even more convoluted, Smith's effort to apportion for the non-infringing components within the *redacted* % Tomkow royalty rate is unclear or non-existent because at no point does Smith attempt to quantify the value of the Tomkow Patents as to infringing versus non-infringing features.  Smith only hints in a footnote about some left over *redacted* % "cover[s] the contributions of" the Tomkow Patents.[48]  Smith essentially figured a royalty rate, and then concluded that the royalty rate properly reflected the portion of the Accused Products related to the patented concepts.  The so-called apportionment method where Smith "leaves" a certain percentage is not based on any case-specific facts or reliable method and again does not reflect apportionment of the base.  "Although some approximation is permitted in calculating the reasonable royalty, the Federal Circuit requires 'sound economic and factual predicates' for that analysis."[49]  Smith's lip service to the non-infringing features was just that—he in fact undertook no real apportionment.

At bottom, the district court's gatekeeping function under *Daubert* is particularly critical here because Smith will undoubtedly seek to characterize his *royalty rate* as appropriate in consideration of non-infringing features.  Allowing him to do so will result in the advancement of a judicially rejected theory with clear prejudicial impact.[50]  Indeed,

---

[47] *See LaserDynamics, Inc.*, 694 F.3d at 69
[48] Smith Report p. 33, fn. 86; Smith Tr. at 226:10-14.
[49] *IP Innovation L.L.C. v. Red Hat, Inc*., 705 F. Supp. 2d 687, 690 (E.D. Tex. 2010) (quoting *Riles v. Shell Exploration & Production Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002)).
[50] *See ePlus, Inc. v. Lawson Software, Inc.*, 764 F. Supp. 2d 807, 814-15 (E.D. Va. 2011)

1 the Federal Circuit has noted the prejudice that results from introducing the entire market value even if applying a lower royalty rate.[51]  Accordingly, the Court should not permit RPost to "skew the damages horizon for the jury, regardless of the contribution of the patented component" to reach the entirety of Go Daddy's net revenues.[52]

### 2. Smith's Analysis Improperly Applied EMVR Because He Failed to Prove Any Accused Features Were the Basis of Consumer Demand.

Beyond the apportionment problem, Smith's opinion fundamentally fails because of his application of EMVR without consideration of consumer demand. There is a narrow exception to the general requirement that "royalties be based not on the entire product, but instead on the smallest salable patent-practicing unit."[53]  A patentee seeking reasonable royalty damages based on sales of unpatented components, or in other words the entire revenue base, must demonstrate that the patented features create the basis for customer demand for the "entire market value" of all that is included in the royalty base, both patented and unpatented elements alike.[54]  "Damages are recoverable under the entire market value rule only 'if the patented apparatus was of such paramount importance that it substantially created the value of the component parts.'"[55]  The cases on this point are legion: a patentee cannot satisfy the EMVR test when the patented feature is, at most, one of several features that drive demand.[56]

---

(excluding speculative, unsound expert reasonable royalty analysis based on a "dubious royalty base" and other flaws because permitting such "ipse dixit opinion testimony" would amount to "abdicat[ing] the gatekeeping duty imposed by *Daubert* and its progeny").

[51] *See Uniloc*, 632 F.3d at 1320.
[52] *See id.*
[53] *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (internal quotes omitted).
[54] *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011)(explaining "the danger of admitting consideration of the entire market value of the accused where the patented component does not create the basis for customer demand"); *see also Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1306, 1336 (Fed. Cir. 2009).
[55] *LaserDynamics, Inc. v. Quanta Computer, Inc.*, No. 06-348, 2010 WL 2331311, at *2 (E.D. Tex. June 9, 2010) (quoting *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549 (Fed. Cir. 1995)).
[56] *See, e.g., Oracle Am., Inc. v. Google Inc.*,798 F. Supp. 2d 1111, 1115-16 (N.D. Cal. 2011) (refusing to apply entire market value rule: "The fact that Java may be a critical component of Android does not justify application of the entire market value rule. Wheels are critical to an automobile, but no one would apportion all of the demand for a car to just the wheels. It seems highly unlikely that Android derives its entire value

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, Arizona 85004-2555

As but one example, in *Cornell Univ. v. Hewlett-Packard Co.*, Judge Rader, sitting by designation, applied this principle to preclude patentee Cornell from relying on the entire market value of servers and workstations sold by Hewlett-Packard as the royalty base for a reasonable royalty analysis, where the patent was only directed to one feature in HP's processors, which processors in turn were merely one feature of HP's servers and workstations.[57] As the court explained, Cornell failed to adduce competent evidence of a link between the use of the patented feature in HP's processors and consumer demand for its complete servers and workstations.[58]

Here, *Cornell* applies in all respects. Smith unquestionably used the Accused Products' entire net revenues in the royalty base, while failing to provide any evidence that the patented features were the basis for consumer demand. His creation of a "leftover" **redacted** % of net revenues in his *royalty rates* analysis suggests there is a multitude of non-infringing features that might contribute to revenue, but his calculations inexplicably use the entire revenue base as a textbook EMVR calculation. Smith only notes marketing materials and the mention of one of the accused features among many non-infringing features in such materials to conclude that the accused feature is somehow important to consumers. But this is nowhere near the required proof to approach damages under an EMVR model. When challenged on this point, Smith's only answer is to suggest that while he used GoDaddy's entire revenue stream as his royalty base, he could do so without the need to show consumer demand because, in his mind, the

---

from a small set of infringing features, given its breadth."); *Carefusion 303, Inc. v. Sigma Int'l*, No. 10cv0442, 2012 WL 392808, *2-3 (S.D. Cal. Jan. 3, 2012) (refusing to apply entire market value rule because more than one feature contributed to demand); *Mformation Techs., Inc. v. Research in Motion Ltd.*, No. C 08–04990, 2012 WL 1142537, *4 (N.D. Cal. Mar. 29, 2012) ("[T]he application of the entire market value rule is not warranted in this case, because [plaintiff's expert] did not adequately attribute all of Defendants' customer demand to use of the Patent-In-Suit."); *Inventio Ag v. Otis Elevator Co.*, No. 06 Civ. 5377, 2011 WL 3359705, *4 (S.D.N.Y. June 23, 2011) (characterizing relevant inquiry as whether "customer demand for an entire elevator system was based on one aspect of that system . . . rather than on other factors"); *IP Innovation L.L.C. v. Red Hat, Inc.*, 705 F. Supp. 2d 687, 689-90 (E.D. Tex. 2010) (J. Rader sitting by designation) (rejecting application of the entire market value rule because "[t]he claimed invention is but one relatively small component of the accused operating systems.").

[57] *Cornell*, 609 F. Supp. 2d 279, 286-87 (N.D.N.Y. 2009).
[58] *See id.* at 284.

Ballard Spahr LLP
1 East Washington Street
Suite 2300
Phoenix, Arizona 85004-2555

1   accused feature was essential or prominently marketed.  Again, RPost has no evidence to
2   meet its burden of proving that the patented features form the basis of consumer demand
3   for the Accused Products.[59]  In fact, Smith agrees the Accused Products have several
4   features that drive customer demand.[60] This is not enough, nor is this approach remotely
5   sufficient to use an entire revenue stream as a royalty base.[61]

6   Worse, there is substantial evidence in this record that points to the exact *opposite*
7   conclusion advanced by Smith. GoDaddy produced survey evidence concerning the
8   MadMimi product that points to accused features such as tracking and email analytics as
9   relatively low in the priority of features consumers are interested in.  The fact is the
10  Accused Features do not drive consumer demand.

11  Yet Smith largely ignored MadMimi's customer survey and Top Ten Review's
12  comparison of 11 leading email marketing products that provide more reliable evidence
13  than marketing materials to inform the basis for consumer demand.[62]  Instead, Smith
14  argued that the authentication feature (Feldbau Patented concept) was "clearly important"
15  to GoDaddy because GoDaddy listed this feature, along with *nine* other features, for
16  marketing and that Mr. Gilbert stated "it seems like a basic expectation when you send an
17  email that it should end up the same as when it was sent."[63]  Smith offered no support for
18  equating the listed feature "world class infrastructure and authentication tools" or Mr.
19  Gilbert's remark with the concept embodied in the Feldbau Patent.  The very list he relied
20  on contains nine features of GEM, which actually furthers GoDaddy's position that the
21  Accused Products' embody many non-infringing features and thus, the royalty base needs
22  to reflect the other eight features.  It is black letter law under such circumstances that the

---

[59] *See Lucent*, 580 F.3d at 1337 ("Lucent did not carry its evidentiary burden of proving that anyone purchased [Microsoft] Outlook because of the patented method.").
[60] Smith depo. 222:8-16
[61] *See Laser Dynamics*, 694 F.3d at 69 (holding that the expert, "by definition," applied the EMVR by including the product's entire revenues in the royalty base.).
[62] MadMimi survey showed that ***redacted***. *See* Perry Report at p. 25, Sec. 2.4.6.5. The Top Ten Review's comparison showed that the Patented Features account only for 3 of 33 features of MadMimi's email marketing product. *See id*. at p. 23-4, Sec. 2.4.6.3, and Appx. C.
[63] Smith Report at ¶87.

patentee *cannot* use the entire value of the product as the base for calculating running royalty damages.[64]

Smith's conclusory statements throughout his report that the patented features are "essential" to the Accused Products should carry little weight because, ultimately, they do not measure up to "the basis of consumer demand." To support this "essential" contention, Smith relies on only two things: (1) overstating the significance of GoDaddy's marketing materials and (2) the mischaracterization of Mr. Gilbert's testimony. Smith similarly asserts that the Tomkow "patented features are essential" and "very important selling points" because GoDaddy "prominently features the tracking and reporting features" with no supporting evidence other than Mr. Gilbert's vague testimony that the features are "useful."[65] This does not measure up to proof of consumer demand, and, notably, Smith agrees that there is a difference between an essential element and the basis of consumer demand.[66]

Thus, even considering Smith's conclusion that the patented features are in his mind "essential," this alone does not mean those features form the basis for consumer demand. To justify application of EMVR, Smith needs evidence. What he has is woefully inadequate for EMVR to be presented to a jury. Without any evidence to establish customer demand, and indeed ignoring evidence that demonstrates just the opposite, Smith cannot use GoDaddy's entire revenue stream or advance the EMVR against the Accused Products. Smith's opinion should be excluded.[67]

---

[64] *See Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005).

[65] Smith Report at ¶ 93; Exhibit 5, Excerpts from August 25, 2015 Deposition of Eric Gilbert ("Gilbert Tr.") at 52:17-21.

[66] Smith Tr. 171: 8-13. S*ee Carefusion*, 2012 WL 392808, at *3 (granting summary judgment to preclude the patentee's use of the EMVR because "there is more than one component that could serve as the basis for customer demand. That result, however, is antithetical to the entire market value rule, which requires that the patented feature be 'the 'basis for customer demand.'" (citing *Uniloc*, 632 F. 3d at 1318 (internal citations omitted)).

[67] *See Imonex Servs.*, 408 F.3d 1374, 1380 (Fed. Cir. 2005) (holding that the trial court properly foreclosed further evidence on this unsupported theory since record contained no evidence that the patented features were the basis for customer demand.).

DMWEST #13914094 v1       13

## V. CONCLUSION

Smith does not provide any support that would allow him to use the EMVR, which he clearly used as he applied is selected royalty rates to the Accused Products' entire net revenue. Even then, he attempted to account for the non-infringing components within the royalty rate, which binding Federal Circuit precedent prohibits. As such, Smith's proposed use of a royalty base of 100% of the Accused Products' revenues fails to meet the requirements for reliable economic testimony under *Daubert* and its progeny. Accordingly, GoDaddy respectfully requests that the Court exclude Smith's testimony as unreliable under *Daubert* and, therefore inadmissible under Federal Rule of Evidence 702.

RESPECTFULLY SUBMITTED this 29th day of February, 2016.

BALLARD SPAHR LLP

By: */s/ Brian W. LaCorte*
    Brian W. LaCorte
    Kimberly A. Warshawsky
    Jonathon A. Talcott
    BALLARD SPAHR LLP
    1 East Washington Street, Suite 2300
    Phoenix, AZ 85004-2555
    Telephone: 602.798.5400
    Facsimile: 602.798.5595

*Attorneys for Plaintiff GoDaddy.com, LLC.*

**CERTIFICATE OF SERVICE**

I certify that on the 29th day of February, 2016, I electronically transmitted a PDF version of this document to the Office of the Clerk of the Court, using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants listed for this matter.

By: /s/ Lisa Norris