**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GoDaddy.com LLC,<br><br>　　　　　　　Plaintiff,<br><br>v.<br><br>RPost Communications Limited, et al.,<br><br>　　　　　　　Defendants. | No. CV-14-00126-PHX-JAT<br><br>**ORDER** |

　　　　Pending before the Court is Plaintiff GoDaddy.com LLC ("GoDaddy")'s Motion to Preclude Testimony of Defendants' Damages Expert Gregory Smith, (Docs. 266; 292-1 at 2–15).[1] The Court now rules on the mot ion.

**I.　Background**

　　　　GoDaddy moves the Court to exclude the testimony of Defendants'[2] damages expert, Gregory Smith, as unreliable under Federal Rule of Evidence ("FRE") 702. (*Id.*) GoDaddy contends that Mr. Smith's testimony is unreliable for two reasons: "(1) [Mr.] Smith inappropriately accounted for non-infringing features in his royalty rate analysis rather than apportioning the royalty base, and (2) he applied the entire market value rule

---

[1] After a flurry of motions to seal, the Court ordered the parties to file in non-redacted format several documents that were initially filed in redacted format. *See* (Docs. 281, 290). Docket 292-1 contains a few of these documents, including GoDaddy's motion to preclude.

[2] Defendants are RPost Communications Ltd.; RPost Holdings, Inc.; RPost International Ltd.; and RMail Ltd. Defendants are collectively referred to as "RPost."

without demonstrating that the patented features form the basis of consumer demand as required by binding Federal Circuit precedent." (*Id.* at 1). According to GoDaddy, "[t]he law is clear that there is only *one* scenario where a patentee may use the entire market value of an accused product as its royalty base *without* further apportioning that base, as Smith did, which is: under the [entire market value rule] . . ." (Doc. 286 at 4). Because GoDaddy believes Mr. Smith did not satisfy the entire market value rule ("EMVR")'s requirements, it contends "that should be the end of the inquiry." (*Id.*)

In response, RPost insists that Mr. Smith "unequivocally" did not apply the EMVR because the Accused Products[3] are the smallest saleable unit ("SSU"). (Doc. 279 at 2). According to RPost, the Federal Circuit has not defined a particular formula for apportioning damages for SSU products, and Mr. Smith properly followed the Federal Circuit-endorsed apportionment factors outlined in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970). (*Id.*) Specifically, RPost insists that the Federal Circuit has never held that a royalty base must be apportioned to account for non-infringing elements in lieu of the corresponding royalty rate. (*Id.* at 6). Further, RPost contends that the Accused Products are not multi-component products, but that the Accused Products, "as a whole," infringe its patents. (*Id.* at 13). Nonetheless, by "apportioning" the operating margin of the Accused Products to obtain the royalty rate, RPost argues that "Mr. Smith calculate[d] a rate that reflects the patented technology's contribution to the profitability of the accused products." (*Id.* at 1).

The question before the Court is relatively straightforward: did Mr. Smith calculate damages using a methodology that is consistent with Federal Circuit precedent? There are two general methods for determining infringement compensation: (1) the lost profits method, which estimates a patentee's lost income due to the alleged infringement, or (2) the application of a reasonable royalty rate to a royalty base. *See Lucent Techs. Inc.*

---

[3] The "Accused Products" are GoDaddy's Express Email Marketing System, GoDaddy Email Marketing products, and the MadMimi email marketing product. (Doc. 266 at 1–2).

*v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). In this case, Mr. Smith calculated RPost's damages using the reasonable royalty method. *See* (Doc. 292-1 at 29).

## II.     Legal Standards

### A.     Expert Opinion Testimony

In patent infringement litigation, regional circuit law controls the Court's analysis for issues not unique to patent law. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 66 (Fed. Cir. 2012). Thus, the Court's decision to admit expert testimony in a patent case follows the law of the regional circuit. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1390–91 (Fed. Cir. 2003).

FRE 702 governs the admissibility of expert testimony and provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court of the United States held that FRE 702 imposes an obligation upon trial courts to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. 579, 589 (1993). Thus, FRE 702 cloaks trial courts with the role of gatekeeper to determine, pursuant to FRE 104(a), whether expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Id.* at 592. "It is the proponent of the expert who has the burden of proving admissibility." *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996).

*Daubert*, which concerned the admission of expert testimony based upon scientific studies, enumerated several nonexclusive factors that a trial court may use to determine whether testimony based upon scientific knowledge is sufficiently reliable. These factors include whether the "theory or technique has been subjected to peer review and

publication," "the known or potential rate of error," "the existence and maintenance of standards controlling the technique's application," and whether the technique has been generally accepted in the relevant scientific community. *Daubert*, 509 U.S. at 593–94. Nevertheless, the Supreme Court hinted that a trial court's gatekeeping obligation under FRE 702 extended to all forms of expert testimony, not just those concerning scientific knowledge. *See id.* at 590 n.8 ("Our discussion is limited to the scientific context because that is the nature of the expertise offered here."). The Court emphasized that the inquiry was "a flexible one" with "[i]ts overarching subject" as "the scientific validity and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission." *Id.* at 594–95.

In *Kumho Tire Co. v. Carmichael*, the Supreme Court clarified that a trial court's gatekeeping obligation indeed applies to all expert testimony, even if, for example, that testimony is based upon experiential or other non-scientific knowledge. 526 U.S. 137, 147 (1999). Although a trial court may find the factors enumerated in *Daubert* to be "appropriate for use in determining the reliability of challenged expert testimony" even for testimony based upon other than scientific knowledge, *id.* at 152, it is not constrained to such questions. The trial court has "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Id.* at 152. Thus, "where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has 'a reliable basis in the knowledge and experience of [the relevant] discipline.'" *Id.* (quoting *Daubert*, 509 U.S. at 592).

A trial court must do more than ensure that expert testimony is reliable, however; it must also ensure that such testimony is relevant to an issue in the case. FRE 702 "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591–92. As the rule states, the proposed testimony must "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. "Federal judges must . . . exclude proffered scientific evidence under

- 4 -

1 [FRE] 702 and 403 unless they are convinced that it speaks clearly and directly to an issue in dispute in the case, and that it will not mislead the jury." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1321 n.17 (9th Cir. 1995) [hereinafter *Daubert II*].

In the course of assessing the reliability and relevance of an expert's proposed testimony, a trial court must be mindful that its role is that of "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (quoting *United States v. Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)). "[T]he test under *Daubert* is not the correctness of the expert's conclusion but the soundness of his methodology." *Daubert II*, 43 F.3d at 1318. "Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. Thus, "the gate [cannot] be closed to [a] relevant opinion offered with sufficient foundation by one qualified to give it." *Id.* at 568; *see Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) ("A judge must be cautious to not overstep its gatekeeping role and weigh facts, evaluate the correctness of conclusions, impose its own preferred methodology, or judge credibility, including the credibility of one expert over another. These tasks are reserved solely for the fact finder.").

**B.     Calculating Damages under the Reasonable Royalty Method**

The starting point for damages in a patent infringement lawsuit is 35 U.S.C. § 284, which limits damages to those "adequate to compensate for the infringement." 35 U.S.C. § 284. For reasonable royalties, the damages must reflect "the use made of the invention by the infringer." *Id.* The most common method to determine a reasonable royalty is the hypothetical negotiation approach, which "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent*, 580 F.3d at 1324. Although a hypothetical negotiation "necessarily involves an element of approximation and uncertainty," *id.* at 1325, it "must be based on sound economic and factual predicates," *LaserDynamics*, 694 F.3d at 67

(quotation omitted).

"A reasonable royalty may be a lump-sum payment not calculated on a per unit basis, but it may also be, and often is, a running payment that varies with the number of infringing units. In that event, it generally has two prongs: a royalty base and a royalty rate." *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014). Thus, to calculate a reasonable running royalty, two steps are required. "First, it requires the determination of a royalty base, 'or the revenue pool implicated by the infringement.' The second determination is the royalty rate, or 'the percentage of that pool adequate to compensate the plaintiff for that infringement.'" *Dynetix Design Sols., Inc. v. Synopsys, Inc.*, 2013 U.S. Dist. LEXIS 120403, at *7 (N.D. Cal. Aug. 22, 2013) (quoting *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009)).

The Federal Circuit has warned that, "[w]here small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *LaserDynamics*, 694 F.3d at 67. For that reason, "it is generally required that royalties be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *Id.* (quoting *Cornell*, 609 F. Supp. 2d at 283, 287–88). Once the SSU has been identified, the royalty must be further apportioned to reflect the "incremental value that the patented invention adds to the end product." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014)); *see, e.g.*, *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (holding that a patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). As the Federal Circuit recently explained,

> [T]he [SSU] approach was intended to produce a royalty base much more closely tied to the claimed invention than the entire market value of the accused products. . . . In other words, the requirement that a patentee

> identify damages associated with the smallest salable patent-practicing unit is *simply a step* toward meeting the requirement of apportionment. *Where the smallest salable unit is, in fact, a multi-component product containing several non-infringing features with no relation to the patented feature . . . , the patentee must do more to estimate what portion of the value of that product is attributable to the patented technology*. To hold otherwise would permit the entire market value exception to swallow the rule of apportionment.

*VirnetX*, 767 F.3d at 1327–28 (emphasis added).

In 2015, the Federal Circuit clarified that a patentee need not apportion a royalty base in lieu of the royalty rate in every case. In *Ericsson*, a case involving a RAND-encumbered patent, the Federal Circuit further explained apportionment principles in light of *VirnetX* as follows:

> [W]here multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more. [*VirnetX*,] 767 F.3d at 1326 . . . .
>
> When the accused infringing products have both patented and unpatented features, measuring this value requires a determination of the value added by such features. Indeed, apportionment is required even for non-royalty forms of damages: a jury must ultimately "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features" using "reliable and tangible" evidence. *Garretson*, 111 U.S. at 121. *Logically, an economist could do this in various ways—by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof.* The essential requirement is that the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product.
>
> Our cases have added to that governing legal rule an important evidentiary principle. The point of the evidentiary principle is to help our jury system reliably implement the substantive statutory requirement of apportionment of royalty damages to the invention's value. The principle, applicable specifically to the choice of a royalty base, is that, where a multi-component product is at issue and the patented feature is not the item which imbues the combination of the other features with value, care must be taken to avoid misleading the jury by placing undue emphasis on the value of the entire product. *It is not that an appropriately apportioned royalty award could never be fashioned by starting with the entire market value of a*

- 7 -

> *multi-component product—by, for instance, dramatically reducing the royalty rate to be applied in those cases—it is that reliance on the entire market value might mislead the jury, who may be less equipped to understand the extent to which the royalty rate would need to do the work in such instances.* See LaserDynamics, 694 F.3d at 67, 68 (barring the use of too high a royalty base—even if mathematically offset by a "low enough royalty rate"—because such a base "carries a considerable risk" of misleading a jury into overcompensating, stating that such a base "cannot help but skew the damages horizon for the jury" and "make a patentee's proffered damages amount appear modest by comparison" (quoting *Uniloc*, 632 F.3d at 1320)). Thus, where the entire value of a machine as a marketable article is "properly and legally attributable to the patented feature," the damages owed to the patentee may be calculated by reference to that value. *Id.* Where it is not, however, courts must insist on a more realistic starting point for the royalty calculations by juries—often, the [SSU] and, at times, even less. *VirnetX*, 767 F.3d at 1327–28.

773 F.3d at 1226–27. At bottom, the "essential requirement" for an expert's damages analysis is that the damages figure be "based on the incremental value that the patented invention adds to the end product." *Id.* at 1226.

The EMVR is a narrow exception to the apportionment requirement and "allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." *TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986); *see Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1268 (Fed. Cir. 2013) ("A patentee may assess damages based on the entire market value of the accused product only where the patented feature creates the basis for customer demand or substantially creates the value of the component parts." (quotation omitted)). Thus, if the patented feature creates the basis for consumer demand of a multi-component product, a royalty may be calculated based on the value of the complete product, even though the patent does not cover the complete product. *See LaserDynamics*, 694 F.3d at 68; *Lucent*, 580 F.3d at 1337.

The strict standards curtailing the EMVR ensure that the royalty "does not overreach and encompass components not covered by the patent." *LaserDynamics*, 694 F.3d at 70. Thus, "[i]t is not enough to merely show that the [patented feature] is viewed

as valuable, important, or even essential to the use of the [overall product]" or that a product without the patented feature would not be commercially viable. *Id.* at 68. Instead, "a reasonable royalty analysis requires a court to . . . carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010). To that end, the Federal Circuit prudently "cautioned against reliance on the entire market value of the accused products because it 'cannot help but skew the damages horizon for the jury, regardless of the contribution of the patented component to this revenue.'" *VirnetX*, 767 F.3d at 1326 (quoting *Uniloc*, 632 F.3d at 1320); *see LaserDynamics*, 694 F.3d at 68 ("Admission of [an entire product's revenues], which have no demonstrated correlation to the value of the patented feature alone, only serve to make a patentee's proffered damages amount appear modest by comparison, and to artificially inflate the jury's damages calculation beyond that which is adequate to compensate for the infringement." (quotation omitted)).

If a patentee fails to show that the patented technology satisfies the EMVR's requirements, "principles of apportionment apply." *Id.* Thus, "where multi-component products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson*, 773 F.3d at 1226 (citing *VirnetX*, 767 F.3d at 1326). In this regard, the patentee must "give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *LaserDynamics*, 694 F.3d at 67–68 (citing *Garretson*, 111 U.S. at 121). In this regard, "[t]he Supreme Court and [Federal Circuit]'s precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." *Uniloc*, 632 F.3d at 1320 (citations omitted); *see VirnetX*, 767 F.3d at 1327 (deeming defective a jury instruction that "mistakenly suggest[ed] that when the [SSU] is used as the royalty base, there is necessarily no further constraint on the selection of the base").

### III. Analysis

GoDaddy contends that Mr. Smith's damages report is unreliable as to both the Feldbau and Tomkow Patents. *See* (Doc. 266). The Court will analyze each in turn.

#### A. Feldbau Patent

##### 1. Mr. Smith's Approach

Applying the well-known hypothetical negotiation approach, Mr. Smith determined that Authentix Authentication Technologies, Ltd. ("Authentix")[4] and GoDaddy would have agreed to a 2.5% running royalty of the Accused Products' net revenues. (Doc. 292-1 at 55). According to Mr. Smith, his royalty rate and royalty base are appropriate because: (1) the Accused Products "are essentially the smallest saleable unit"; (2) 10% of GoDaddy's profits for the Accused Products are attributable to the Feldbau Patent as GoDaddy marketed the authentication functionality as one of nine major features; (3) 2.5% is less than 10% of GoDaddy's operating margins for the Accused Products; (4) Authentix was in financial distress at the time of the hypothetical negotiation; and (5) RPost rejected a licensing offer from Authentix that included a royalty rate of 5% increasing to 8% of "total revenues"[5] derived from the Feldbau Patent's technology and 2.5% is half of this offer. (*Id.* at 52–55). Thus, Mr. Smith attempted to separate RPost's damages from GoDaddy's profits by apportioning the royalty rate instead of the royalty base. (*Id.*)

##### 2. Analysis

To begin, the Court is highly skeptical of Mr. Smith's swift conclusion that profits

---

[4] At the time of the hypothetical negotiation in 2008, the Feldbau Patent was owned by a company called Authentix. (Doc. 292-1 at 30). On February 2, 2009, RPost acquired the Feldbau Patent from Authentix along with another U.S. Patent and certain foreign patents for $800,000. (*Id.*) Thus, Mr. Smith crafted his hypothetical negotiation between Authentix and GoDaddy. (*Id.*)

[5] In its response brief, RPost claims that Authentix's proposed royalty rate increased from 5% to 8% of "net revenues." (Doc. 312-1 at 9). The offer itself is not in the record.

- 10 -

1 attributable to the Feldbau Patent's technology constitute 10% of the Accused Products'
2 overall profits. In making this determination, the only evidence Mr. Smith relies on is one
3 Internet marketing webpage with an Indian Internet country code top-level domain[6] and a
4 statement from GoDaddy marketing official Eric Scott Gilbert that a basic expectation for
5 an email marketing service is knowledge that content has been sent without tampering.
6 *See* (Doc. 292-1 at 55). While it is true that "[s]haky but admissible evidence is to be
7 attacked by cross-examination, contrary evidence, and attention to the burden of proof,
8 not exclusion," *Primiano*, 598 F.3d at 564, the evidence relied on by Mr. Smith in his
9 report is irrelevant, conjectural, and simply not enough to satisfy *Daubert*. The Federal
10 Circuit is clear that a patentee's evidence "to separate or apportion the defendant's profits
11 and the patentee's damages between the patented feature and the unpatented features . . .
12 must be reliable and tangible, . . . not conjectural or speculative." *LaserDynamics*, 694
13 F.3d at 67–68 (citing *Garretson*, 111 U.S. at 121). This is not a case where Mr. Smith
14 relied on "shaky" evidence that should be weighed by the jury—the evidence is
15 completely irrelevant to the apportionment inquiry. How GoDaddy markets the Accused
16 Products to its Indian consumers is immaterial to how the Accused Products function
17 within the United States, particularly without any evidence showing that GoDaddy's
18 products are the same across both countries. As to Mr. Gilbert's testimony, there is no
19 indication that he ever stated that 10% of the Accused Products' profits are attributable to
20 the patented technology. Simply put, Mr. Smith relies on entirely irrelevant evidence and
21 "vague qualitative notions of the relative importance" of the patented technology to assert
22 that 10% of the Accused Product's profits should be apportioned to the patented
23 technology. *See LaserDynamics*, 694 F.3d at 69. This does not satisfy *Daubert*.

24 Even if there was reliable and tangible evidence to support Mr. Smith's 10%

---

26 [6] Specifically, Mr. Smith states that "GoDaddy touts that its service provides
27 secure, authenticatable messaging" and cites to "https://in.godaddy.com/business/email-marketing." (Doc. 292-1 at 55). Because Mr. Smith contends that the negotiation is for a
28 "license [that] would be non-exclusive *for the United States*," (*id.* at 46), his citation to a GoDaddy Indian marketing website is misplaced.

- 11 -

apportionment figure, RPost and Mr. Smith failed to provide the Court with any evidence showing that the Accused Products are in fact the SSU, and it is RPost's burden to do so. *See, e.g.*, *Uniloc*, 632 F.3d at 1315 (noting that a "patentee bears the burden of proving damages" by "sufficiently [tying] the expert testimony on damages to the facts of the case" (citations omitted)). The only sentence in Mr. Smith's report that even arguably identifies the Accused Products as the SSU is opaque at best: "[w]hile the accused services are essentially the smallest saleable unit, these other features contribute to the overall value of the service." (Doc. 292-1 at 52). The Federal Circuit makes clear that an SSU containing infringing and non-infringing features may be used as the basis for a reasonable royalty only if the product overall bears "a sufficiently close relation to the claimed functionality." *VirnetX*, 767 F.3d at 1329.[7] Mr. Smith did not support his loose statement with any evidence, nor did he expound upon his assertion during his

---

[7] RPost argues that "[t]his is not a case where small elements of multi-component products are accused of infringement. Rather, RPost accuses GoDaddy's email marketing products as a whole of infringement." (Doc. 279 at 13) (citations omitted). RPost, however, points to no evidence to support this argument and the record evidence, RPost's infringement positions, and the multiple technological features that comprise the Accused Products all point to the contrary.

At the outset, RPost unequivocally asserts that only certain technological components of the Accused Products infringe the Tomkow and Feldbau Patents and argues that Mr. Smith "expressly accounted for the non-infringing aspects of the accused products [by] exclud[ing] them from his damages estimate." (Doc. 279 at 6); *see* (Doc. 292-1 at 52) ("The accused email marketing services do contain features that are not covered by the patents-in-suit."). These facts alone make it inconsistent for RPost to claim that the Accused Products are not multi-component products that violate its patents "as a whole." Furthermore, despite RPost's claim to the contrary, this is not a case where the patented technology fully represents the product that is the subject of the claims. *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338 (Fed. Cir. 2015). Instead, numerous non-infringing features are integrated into the Accused Products, such as message creation, transmission, contacts management, user interface, storage, and customer support. *See* (Docs. 292-1 at 19, 52). Consequently, RPost is not asserting—nor has it ever asserted—that the Accused Products, "as a whole," violate its patents. *See Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co., Ltd.*, 2015 WL 8916113, at *5 (E.D. Mo. Dec. 15, 2015) (rejecting patentee's argument that patented feature constituted the accused product "as a whole" because it was "inconsistent" with expert's report and the record).

- 12 -

deposition. *See* (Docs. 266 at 3–4; 292-1 at 52). While problematic, RPost's unsupported claim that the Accused Products are the SSU vanishes in the shadow of GoDaddy's evidence tending to demonstrate the exact opposite. *See* (Doc. 286-1 at 3–4). In short, there is no evidence establishing that the Accused Products overall bear "a sufficiently close relation" to the Feldbau Patent technology such that the Accused Products' total net revenue may be used as a royalty base. *VirnetX*, 767 F.3d at 1329.

Finally, the problems with Mr. Smith's analysis are camouflaged by his conflated pronouncement that the 2.5% royalty rate is "well below the expectation of Authentix (half of the initial rate . . .)." (Doc. 292-1 at 55). In his report, Mr. Smith considered the licensing offer RPost received from Authentix that included a 5% royalty of total revenues generated by the Feldbau Patent's technology. (*Id.* at 45, 54–55). Pragmatically, this licensing offer concerned a royalty based on revenues generated by the patented technology *only*. In contrast, the Feldbau Patent's technology—"essential" as it may be—is *not* the Accused Products' *only* feature. *See* (Docs. 279 at 3, 13; 286 at 3; 292-1 at 52–53). In fact, Mr. Smith observed that "[i]n this case, there are several features that . . . drive consumer demand," (Doc. 292-1 at 97), and even attempted to apportion 90% of the Accused Products' profits to those non-infringing components, (*id.* at 55). Because Authentix's licensing offer to RPost was based on revenues generated by *one* patented technology, while the Accused Products generate revenue due to *multiple* non-infringing features beyond the Feldbau Patent's technology, Mr. Smith incorrectly assumed that the terms of the Authentix offer were suitable comparators for the terms of a licensing agreement between Authentix and GoDaddy without highlighting the circumstantial differences. *See, e.g.*, *VirnetX*, 767 F.3d at 1330 ("[L]icenses relied on by the patentee in proving damages [must be] sufficiently comparable to the hypothetical license at issue in suit."). Although the circumstances need not be identical, *see Ericsson*, 773 F.3d at 1228, it was disingenuous for Mr. Smith to conflate the Authentix offer with the hypothetical negotiation without discussing the fundamental differences, *see id.* (holding that license-based evidence can be relevant and reliable if the expert testimony explains the need to

discount reliance on a given license in order to account only for the value attributed to the licensed technology).

RPost insists that "there may be more than one reliable method for estimating a reasonable royalty." (Doc. 279 at 12) (quoting *Apple*, 757 F.3d at 1318). Although this statement is certainly true, the "data utilized in [Mr. Smith's] methodology is [not] sufficiently tied to the facts of the case." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). None of the examples listed by the Federal Circuit in *Apple* as reliable methods—such as "us[ing] the royalty rate from sufficiently comparable licenses, valu[ing] the infringed features based upon comparable features in the marketplace, or estimate[ing] the value of the benefit provided by the infringed features by a [sic] comparing the accused product to non-infringing alternatives," 757 F.3d at 1318—entitle Mr. Smith to commit the foundational errors peppered throughout his report. Mr. Smith failed to provide evidence showing that the Accused Products are the SSU or that the Accused Products have "a sufficiently close relation to the claimed functionality" of the Feldbau Patent's asserted claims such that the Accused Products' net revenues may be used as the royalty base. *See VirnetX*, 767 F.3d at 1327–29. Nor did Mr. Smith point to any reliable, tangible evidence to support his testimony that 10% of the Accused Products' profits is directly attributable to the Feldbau Patent's technology. Finally, Mr. Smith incorrectly assumed that the licensing offer Authentix made to RPost was an unblemished indicator of Authentix's expectations for licensing negotiations with GoDaddy. For these reasons, the portion of Mr. Smith's damages report pertaining to the Feldbau Patent is excludable as unreliable under Federal Circuit law and FRE 702.

### B.     Tomkow Patents

GoDaddy also challenges Mr. Smith's determination that RPost and GoDaddy would have entered into a licensing agreement for the Tomkow Patents' technology with a 15% royalty of the Accused Products' net revenues. (Doc. 266 at 9). GoDaddy relies primarily on the arguments it made in regards to the Feldbau Patent, namely, that Mr. Smith did not apportion the royalty base and failed to prove that the Tomkow Patents'

technology drove consumer demand for the Accused Products. (*Id.* at 4).

In response, RPost contends that Mr. Smith's 15% royalty rate was reasonable and calculated pursuant to Federal Circuit law. (Doc. 279 at 17). As before, RPost asserts that apportionment of the royalty base is not required by the Federal Circuit. (*Id.*)

### 1. Mr. Smith's Approach

Mr. Smith begins his analysis of the Tomkow Patents by observing that,

> [I]n 2012 RPost was targeting penetration of between 10% and 15% of the relevant market as being appropriate for its services and was achieving margins of around 65% after sales costs. If both parties were charging the same prices, this indicates that the cost to RPost of licensing a party such as GoDaddy would equate to 6.5% and 9.75% of GoDaddy's revenue.

(Doc. 292-1 at 56). Mr. Smith continues by describing that,

> RPost's prices are at least 75 times GoDaddy's prices. Even at a much lower target penetration rate, RPost's effective cost of licensing would still be a multiple many times the 6.5% to 9.75% range calculated above. In fact, even at half of the actual price multiple and a 3% target penetration rate, RPost's expected cost of licensing would equate to a royalty of greater than 30% of net sales.

(*Id.*) Ultimately, Mr. Smith concludes that because e-mail marketing programs are comprised of four main elements and the Tomkow Patents constitute the "core" of one element, "a reasonable royalty for the portfolio of the Tomkow Patents . . . is 15% of net revenue." (*Id.* at 57–58). According to Mr. Smith, "while this would not fully compensate RPost for the potential costs of licensing, it would provide it with a revenue stream from its patents." (*Id.* at 58).

### 2. Analysis

Notwithstanding the inherent difficulties of estimating damages in a patent infringement lawsuit, the Court is perplexed as to how Mr. Smith determined that 15% of the Accused Products' net revenue was a reasonable royalty rate. Initially, Mr. Smith and RPost again fail to present any evidence showing that the Accused Products are the SSU. As noted above, this is RPost's burden. *See Uniloc*, 632 F.3d at 1315. Notwithstanding this fundamental issue, additional problems plague Mr. Smith's report as well.

To begin, Mr. Smith does not explain how *RPost's* targeted market penetration rate and operating margins can lead to a royalty rate based on *GoDaddy's* revenue. Even if the parties were "charging the same prices," there are numerous other reasons why a consumer might choose to utilize the Accused Products' services rather than those offered by RPost. As Mr. Smith explained, there are several essential, non-infringing features of the Accused Products such as message creation, contact management, and transmission that might entice a consumer to select GoDaddy's offerings. (Doc. 292-1 at 52–53). In fact, GoDaddy presented survey evidence showing that other features of the Accused Products drove consumer demand. *See* (Docs. 266 at 12; 292-1 at 17–22). To that end, Mr. Smith presents no evidence that every "targeted" RPost customer would select GoDaddy's products if the parties entered into a licensing agreement. Instead, Mr. Smith assumes that if the parties had entered into a licensing agreement, then all of RPost's "targeted" customers would have flocked—exclusively—to GoDaddy. For these reasons, using GoDaddy's revenue as a royalty base is questionable at best.[8]

Beyond these evidentiary deficiencies, because Mr. Smith used the entire net revenue stream of the Accused Products as the royalty base, "the royalty rate would need to do the work." *Ericsson*, 773 F.3d at 1227. To that end, Mr. Smith failed to explain how his 15% royalty rate adequately separated GoDaddy's profits from RPost's damages, i.e., "d[id] the work." Bizarrely, Mr. Smith does not even mention in his report that he apportioned for any non-infringing features when he determined that 15% was an appropriate royalty rate. *See* (Doc. 292-1 at 56–58). In spite of RPost's attempts to clarify Mr. Smith's royalty rate, *see* (Doc. 279 at 16–17), it appears that Mr. Smith plucked 15% out of thin air. *See LaserDynamics*, 694 F.3d at 69 (rejecting an apportionment that was "plucked out of thin air based on vague qualitative notions of the relative importance of [the accused technology]").

---

[8] Also problematic is the lack of any evidence supporting RPost's "targeted" market rate. The Court questions what would prevent RPost from claiming a 100% "targeted" market, thereby dramatically increasing the damages figure.

- 16 -

1 Furthermore, Mr. Smith failed to identify how and why the "actual price multiple" 2 applies to this analysis but concluded that "half of the actual price multiple" with a "3% 3 target penetration rate" means that the royalty would be 30% or higher of net sales. 4 (Doc. 292-1 at 56). Mr. Smith never describes the significance of those factors or why he 5 selected a market penetration rate less than RPost's targeted rate. The mere fact of 6 selecting a lower rate is not sufficient—there must be "reliable and tangible" evidence 7 "tending to separate or apportion the defendant's profits and the patentee's damages 8 between the patented feature and the unpatented features." *LaserDynamics*, 694 F.3d at 9 67–68. Instead, Mr. Smith simply states in a vacuum that 15% of the Accused Products' 10 net revenue is appropriate. Although Mr. Smith implied that 15% was a conservative 11 estimate in light of RPost's "potential costs of licensing," (Doc. 292-1 at 58), this 12 arbitrary gesture did not come with the reward of not supporting the gesture with 13 evidence.

14 Accordingly, the problems plaguing Mr. Smith's damages analysis for the Feldbau 15 Patent arise again with the Tomkow Patents.[9] Mr. Smith failed to provide any evidence 16 showing that his royalty rate was justified and instead grounded the majority of his 17 analysis on speculation and conjecture. Mr. Smith also failed to provide any evidence 18 showing that the Accused Products are the SSU. Most problematic, however, is the fact 19 that Mr. Smith did not even attempt to apportion his royalty rate and simply pronounced 20 that 15% of the Accused Products' net revenue was adequate. The arbitrariness found in 21 Mr. Smith's conclusions violates Federal Circuit precedent.

---

[9] The Court notes the paradigm shift in Mr. Smith's methodology between the Feldbau and Tomkow Patents. For the Feldbau Patent, Mr. Smith attempted to apportion a percentage of the Accused Products' operating margin to the Feldbau Patent's technology. As to the Tomkow Patents, however, Mr. Smith did not attempt to apportion the Accused Products' operating margin at all. Instead, Mr. Smith nakedly asserted that 15% of the Accused Products' net revenue was an appropriate royalty rate with no mention of the operating margin.

- 17 -

### C. Conclusion for Patents-in-Suit

For the reasons set forth above,[10] the Court concludes that the conclusions of Mr. Smith's damages report are inadmissible. There is no evidence in the record to show that the Accused Products are in fact the SSU. Regardless of whether or not the Accused Products are the SSU, Mr. Smith was obligated to attempt "the exceedingly difficult and error-prone task of discerning [the patented technology's] value relative to all other components in the [Accused Products]." *LaserDynamics*, 694 F.3d at 67–68. In this regard, there is no "reliable and tangible" evidence to support Mr. Smith's selected royalty rates for the Feldbau Patent or the Tomkow Patents. Accordingly, Mr. Smith's

---

[10] GoDaddy argues that "[e]ven if Smith [apportioned the royalty rate] . . . , Smith's obligation to apportion the royalty base is not satisfied by selecting an SSU that encompasses unpatented features. And even if the entire Accused Products were the SSU . . . , Smith still failed to apportion a royalty *base*, skipping that step to apportion the royalty rate instead." (Doc. 286 at 3). This statement is not an accurate recitation of Federal Circuit law. For multi-component SSU products with non-infringing features, the Federal Circuit requires a patentee to apportion the patentee's damages from the alleged infringer's profits. There is not, however, a bright-line rule obligating a patentee to apportion the royalty *base* in lieu of the royalty *rate* in every circumstance. *See Ericsson*, 773 F.3d at 1226 ("Logically, an economist could [apportion damages from profits] in various ways—by careful selection of the royalty base to reflect the value added by the patented feature, where that differentiation is possible; by adjustment of the royalty rate so as to discount the value of a product's non-patented features; or by a combination thereof."); *VirnetX*, 767 F.3d at 1329 ("[A] patentee's obligation to apportion damages only to the patented feature does not end with the identification of the smallest salable unit if that unit contains signification unpatented features."). Indeed, when a multi-component product is at issue, the Federal Circuit instead requires that "the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Ericsson*, 773 F.3d at 1226 (citing *VirnetX*, 767 F.3d at 1326).

In infringement litigation, a patentee is entitled to the "total profit" earned by the infringing party for the unauthorized use of a patentee's patent. 35 U.S.C. § 289. Under Mr. Smith's approach, the ultimate damages figure is not more than the profits attributable to the patented technology had Mr. Smith first reduced the royalty base by 90% and then multiplied that base by GoDaddy's operating margin. Thus, GoDaddy's complaint that Mr. Smith's theory would result in RPost "disgorg[ing] all of GoDaddy's profits earned from the patented features," (Doc. 286 at 9), is baseless, *see Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1338 (Fed. Cir. 2004) ("There is no rule that a royalty be no higher than the infringer's net profit margin." (citation omitted)).

1 report is excludable.

### D. RPost's Request to Cure

RPost requests that the Court give it an opportunity to "cure" any deficiencies in Mr. Smith's report. (Doc. 279 at 20–21). In consideration of RPost's due process rights and because RPost would be left without any real evidence of damages at trial, the Court will permit it **one** more opportunity to offer a new expert report on damages. *See, e.g.*, *Synopsys*, 2013 U.S. Dist. LEXIS 120403, at *16–17; *Cornell*, 609 F. Supp. 2d at 284. With trial imminent, RPost shall serve on GoDaddy any such report no later than 12:00 p.m. on Monday, May 16, 2016 in accordance with the guidance as set forth above.[11] Should GoDaddy so desire, it may update its own damages expert report,[12] as well as re-depose RPost's expert, no later than Monday, May 23, 2016. There will be no additional discovery beyond these measures.[13]

---

[11] Should Mr. Smith continue his use of the Accused Products' total net revenues as a royalty base, the Court reminds RPost that it will be given only one opportunity to cure and emphasizes the hazards of using a multi-component product's total net revenues as a royalty base. *See, e.g.*, *Ericsson*, 773 F.3d at 1226–27 (highlighting the evidentiary concerns with using the total net revenues as a royalty base); *VirnetX*, 767 F.3d at 1314, 1328 (rejecting damages award because patent covered security over networks used in Apple's iPhone, iPod, iPad, and Mac computers but damages were based on the market value of the products); *LaserDynamics*, 694 F.3d at 68 (rejecting damages award because patent only covered an optical disc drive but damages were based on the entire computer); *Uniloc*, 632 F.3d at 1297, 1318–19 (rejecting damages award because patent only covered Microsoft's Product Activation feature but royalty was based on sales of Microsoft Office and Windows); *Lucent*, 580 F.3d at 1337 (rejecting damages award because patent at issue covered only the date-picker tool in Microsoft Outlook and was only "a very small component of a much larger software program"). To be sure, Mr. Smith must provide evidence that the Accused Products are in fact the SSU and "if [the SSU] still contains significant unpatented features" with "no relation to the patented feature," *VirnetX*, 767 F.3d at 1327–29, "the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more," *Ericsson*, 773 F.3d at 1226 (citing *VirnetX*, 767 F.3d at 1326).

[12] Any update to GoDaddy's expert report must be limited to refuting/addressing changes to RPost's expert report.

[13] In other words, RPost will not be permitted to re-depose GoDaddy's expert after

- 19 -

### IV. Conclusion

For the foregoing reasons,

**IT IS ORDERED** that GoDaddy's Motion to Preclude Testimony of Defendants' Damages Expert Gregory Smith (Doc. 266) is **GRANTED**.

**IT IS FURTHER ORDERED** that by no later than 12:00 p.m. on Monday, May 16, 2016, RPost is permitted to serve a new expert damages report on GoDaddy.

**IT IS FINALLY ORDERED** that by no later than Monday, May 23, 2016, GoDaddy is permitted to re-depose RPost's expert and serve on RPost any update to its own expert damages report.

Dated this 10th day of May, 2016.

*James A. Teilborg*
Senior United States District Judge

---

he or she amends GoDaddy's report; nor will either party have any other additional discovery.