**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| GoDaddy.com LLC, | No. CV-14-00126-PHX-JAT |
| Plaintiff, | **ORDER** |
| v. | |
| RPost Communications Limited, et al., | |
| Defendants. | |

Pending before the Court are Plaintiff GoDaddy.com LLC ("GoDaddy")'s Motion for Summary Judgment, (Doc. 257), and Defendants'[1] Motion for Summary Judgment on Plaintiff's Count I (Fraudulent Misrepresentation of Patent Ownership), (Doc. 284). The Court now rules on the motions.

## I.    Background

After multiple rounds of motions to dismiss, briefing for a three-month stay, complete *Markman* review, a *Daubert* motion, and dozens of other motions, the factual background of this case is well-established. In short, GoDaddy filed this Declaratory Judgment Action against RPost, seeking, among other things, damages for fraudulent misrepresentation and declarations of invalidity and non-infringement of various patents (the "Asserted Patents")[2] after RPost attempted to enforce those patents against

---

[1] Defendants are RPost Communications Ltd.; RPost Holdings, Inc.; RPost International Ltd.; and RMail Ltd. Defendants are collectively referred to as "RPost."

[2] The Asserted Patents are (1) U.S. Patent No. 8,224,913 (filed July 17, 2012) (the

1   GoDaddy. (Doc. 46 at 38). RPost counterclaimed, alleging that GoDaddy is liable for

2   direct infringement of the Asserted Patents. (Doc. 108 at 20–27).

3   **II.    Legal Standard**

4           Summary judgment is appropriate when "the movant shows that there is no

5   genuine issue as to any material fact and that the moving party is entitled to summary

6   judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be

7   or is genuinely disputed must support that assertion by "citing to particular parts of

8   materials in the record," including depositions, affidavits, interrogatory answers or other

9   materials, or by "showing that materials cited do not establish the absence or presence of

10  a genuine dispute, or that an adverse party cannot produce admissible evidence to support

11  the fact." *Id.* at 56(c)(1). Thus, summary judgment is mandated "against a party who fails

12  to make a showing sufficient to establish the existence of an element essential to that

13  party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*

14  *v. Catrett*, 477 U.S. 317, 322 (1986).

15          Initially, the movant bears the burden of pointing out to the Court the basis for the

16  motion and the elements of the causes of action upon which the non-movant will be

17  unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to

18  the non-movant to establish the existence of material fact. *Id.* The non-movant "must do

19  more than simply show that there is some metaphysical doubt as to the material facts" by

20  "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

21

22  "'913 Patent"); (2) U.S. Patent No. 8,209,389 (filed June 26, 2012) (the "'389 Patent");
    (3) U.S. Patent No. 8,161,104 (filed April 17, 2012) (the "'104 Patent"); (4) U.S. Patent

23  No. 8,468,198 (filed June 18, 2013) (the "'198 Patent"); (5) U.S. Patent No. 8,468,199

24  (filed June 18, 2013) (the "'199 Patent"); and (6) U.S. Patent No. 6,182,219 (filed
    January 30, 2001) (the "'219 Patent"). The '104, '389, '913, '198, and '199 Patents are

25  referred to herein as the "Tomkow Patents." The '219 Patent is referenced as the
    "Feldbau Patent."

26

27  GoDaddy's First Amended Complaint ("FAC") also included Counts for
    declarations of invalidity and non-infringement of U.S. Patent No. 6,571,334. (Doc. 46 at

28  33–34, 36–37). In a prior Order, the Court dismissed those Counts due to a lack of
    justiciable controversy. *See* (Doc. 107 at 9, 14).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e) (1963) (amended 2010)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. Further, because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, . . . [t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor" at the summary judgment stage. *Id.* at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)); *Harris v. Itzhaki*, 183 F.3d 1043, 1051 (9th Cir. 1999) ("Issues of credibility, including questions of intent, should be left to the jury." (citations omitted)).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.* Notably, "[i]t is well settled that only admissible evidence may be considered by the trial court in ruling on a motion for summary judgment." *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).

## III.   GoDaddy's Motion for Summary Judgment

GoDaddy moves for summary judgment on seven issues. First, GoDaddy argues that "the asserted claims of the RPost Patents claim patent-ineligible abstract ideas and are invalid under 35 U.S.C. § 101." (Doc. 257 at 7). Second, GoDaddy contends that the '913 Patent is invalid as "obvious" under 35 U.S.C. § 103. (*Id.*) Third, GoDaddy maintains that the "earliest priority date claimable for the Tomkow Patents" is December 17, 1999. (*Id.*) Fourth, GoDaddy asserts that it has "intervening rights as to the Feldbau

Patent." (*Id.*) Fifth, GoDaddy contends that the Accused Products[3] do not infringe the asserted claims of the Tomkow Patents that recite a "copy" or "representation" of "the message." (*Id.*) Sixth, GoDaddy insists that the Accused Products do not infringe the asserted Feldbau Patent claims. (*Id.*) Finally, GoDaddy moves for summary judgment on the issue of damages. (*Id.*)

### A.    Eligibility of the Asserted Patents

GoDaddy contends that the Asserted Patents are invalid under 35 U.S.C. § 101 because they claim patent-ineligible subject matter. (Doc. 257 at 9–10). Specifically, GoDaddy argues that the Asserted Patents claim "abstract ideas" lacking "inventive concepts sufficient to transform the claimed abstract idea into a patent-eligible application." (Doc. 257 at 10–15) (citing *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 134 S. Ct. 2347, 2354–55 (2014) ("*Alice*")). As to the Feldbau Patent, GoDaddy argues that the claims are drawn to the "abstract idea of collecting and providing information for proving a message was sent to a recipient at a particular time with particular content" without adding an inventive concept sufficient to confer eligibility. (*Id.* at 18). Regarding the Tomkow Patents, GoDaddy contends that the claims are drawn to the abstract idea of "collecting and providing information for verifying transmission and/or delivery of a message" without including an inventive concept to transform that idea into a patent-eligible application. (*Id.* at 14).

In response, RPost asserts that an eligibility challenge under § 101 is not a statutory defense in patent infringement litigation and therefore the Court lacks jurisdiction over GoDaddy's argument. (Doc. 299 at 8–13). According to RPost, neither the Supreme Court of the United States nor the Federal Circuit has expressly held that § 101 is a statutory defense. (*Id.*) RPost explains that the section heading of § 101, "Inventions patentable," takes the statute out of the realm of statutory defenses

---

[3] The "Accused Products" are GoDaddy's Express Email Marketing ("EEM"), GoDaddy Email Marketing ("GEM"), and the MadMimi email marketing product ("MadMimi").

demarcated in 35 U.S.C § 282(b). (*Id.*) In the alternative, RPost argues that the Asserted Patents are directed to patent-eligible subject matter and recite inventive concepts. (*Id.* at 13–22). Specifically, RPost contends that the Feldbau Claims provide a technical solution to a technical problem using an "authenticator." (*Id.* at 20–21). RPost further argues that the Feldbau Claims add an "inventive concept" because the invention requires a physical "transform[ation]" of the information. (*Id.* at 21–22) As to the Tomkow Patents, RPost asserts that GoDaddy's characterization of the patents is a "gross oversimplification." (*Id.* at 14). Instead, RPost insists that the asserted Tomkow Patent claims "recite specific ways to verify delivery of an electronic message using specific information." (*Id.*)

### 1.    Jurisdiction

Before reaching the merits of GoDaddy's eligibility argument, the Court must first determine whether it has jurisdiction over patent-eligibility challenges brought pursuant to § 101. According to RPost, § 101 eligibility is not an authorized statutory defense because § 101 is not listed or referenced in § 282(b), the statute designating patent litigation defenses. (Doc. 299 at 8–13). GoDaddy, on the other hand, believes that its § 101 eligibility challenge is properly before the Court due to a long litany of Federal Circuit and Supreme Court cases interpreting § 101 in the context of patent litigation. (Doc. 314 at 7–8) (citing cases). Most notably, GoDaddy points to the recent landmark decision in which the Supreme Court further refined the standards applicable to § 101 eligibility challenges in patent litigation, *Alice*. (*Id.*)

### a.    Legal Background

Section 282(b) of Title 35 of the United States Code provides an exhaustive catalogue of defenses available to an alleged infringer in an action involving the validity or infringement of a patent:

(1)  Noninfringement, absence of liability for infringement or unenforceability,
(2) Invalidity of the patent or any claim in suit on any ground specified in part II of this title as a condition for patentability,
(3) Invalidity of the patent or any claim in suit for failure to comply with—
      (A) any requirement of section 112, except that the failure to

> disclose the best mode shall not be a basis on which any claim of a patent may be canceled or held invalid or otherwise unenforceable; or
> (B) any requirement of section 251.
> (4) Any other fact or act made a defense by this title.

§ 282(b). For purposes of this case, the pertinent provision of § 282(b) is the second section, which authorizes defenses based on "invalidity of the patent on or any claim in suit on any ground specified in part II of this title as a condition for patentability."

Part II of Title 35 encompasses §§ 100–212. Of these sections, three are relevant here: §§ 101, 102, and 103. Section 101 is entitled "Inventions patentable" and states as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." § 101. Section 102 is labeled "Conditions of patentability; novelty" while Section 103 is designated "Conditions for patentability; non-obvious subject matter." *See* §§ 102, 103.

Fifty years ago, the Supreme Court stated that,

> The [Patent] Act sets out the conditions of patentability in three sections. An analysis of the structure of these three sections indicates that patentability is dependent upon three explicit conditions: novelty and utility as articulated and defined in § 101 and § 102, and nonobviousness, the new statutory formulation, as set out in § 103.

*Graham v. John Deere Co.*, 383 U.S. 1, 12 (1966). Fifteen years after *Graham*, the Supreme Court observed that "Section 101 sets forth the subject matter that can be patented, 'subject to the conditions and requirements of this title.' The conditions under which a patent may be obtained follow [§ 101]." *Diamond v. Diehr*, 450 U.S. 175, 190 (1981) (citing S. Rep. No. 1979, 82d Cong., 2d Sess., 5 (1952); U.S. Code Cong. & Admin. News, 1952, p. 2399)). More recently, the Supreme Court explained that,

> The § 101 patent-eligibility inquiry is only a threshold test. Even if an invention qualifies as a process, machine, manufacture, or composition of matter, in order to receive the Patent Act's protection the claimed invention must also satisfy "the conditions and requirements of this title." § 101. Those requirements include that the invention be novel, *see* § 102, nonobvious, *see* § 103, and fully and particularly described, *see* § 112.

*Bilski v. Kappos*, 561 U.S. 593, 602 (2010). Two years later, the Supreme Court identified a two-part analysis for determining § 101 eligibility in patent litigation. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1296–97 (2012). Finally, in *Alice*, the Supreme Court further developed and refined the *Mayo* two-step inquiry. *See* 134 S. Ct. at 2354–55.

Similarly, although the Federal Circuit has recognized that only §§ 102 and 103 are textually "denominated" as "conditions of patentability," *MySpace, Inc. v. GraphOn Corp.*, 672 F.3d 1250, 1259–60 (Fed. Cir. 2012), it has long held that § 282's defenses "include not only the 'conditions of patentability' in §§ 102 and 103, but also those in § 101," *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1330 n.3 (Fed. Cir. 2012); *see Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 543 F.3d 657, 661, 661 n.3 (Fed. Cir. 2008) (observing that "it is beyond question that section 101's other requirement, that the invention be directed to patentable subject matter, is also a condition for patentability" but noting that "sections 102 and 103," unlike § 101, "are explicitly entitled conditions for patentability"). In other words, the Federal Circuit uniformly holds that § 101 can be raised as a defense in patent infringement litigation. *See, e.g.*, *MySpace*, 672 F.3d at 1261 (recognizing the benefits of shifting invalidity challenges towards §§ 102 and 103 but acknowledging that "Does this mean that § 101 can never be raised initially in a patent infringement suit? No.").

### b.    Analysis

Notwithstanding the complexity of RPost's argument, the Court finds that it has jurisdiction over GoDaddy's § 101 eligibility challenge. In a slightly different context, the Federal Circuit recently addressed this precise question. In *Versata Development Group, Inc. v. SAP America, Inc.*, the Federal Circuit summarized the patentee's argument as follows:

> [Covered Business Method ("CBM")] post-grant review must be limited to a ground that could be raised under paragraph (2) or (3) of section 282(b). [Patentee] then reasons that § 282(b)(2) authorizes defenses on any ground 'specified in part II as a condition for patentability,' and that the part II reference includes under the headings in the compiled statutes only

'conditions for patentability,' i.e., §§ 102 and 103, but not § 101. Based on the headings in part II of the statutes, [Patentee] draws a distinction between the heading under which § 101 appears, 'inventions patentable,' and 'conditions of patentability' under which §§ 102 and 103 are listed.

793 F.3d 1306, 1329–30 (Fed. Cir. 2015). Ultimately, the Federal Circuit held that jurisdiction over the alleged infringer's § 101 eligibility challenge was proper for the following reasons:

[Patentee] is correct that a strict adherence to the section titles can support an argument that § 101 is not listed as a 'condition of patentability,' but rather has the heading of 'inventions patentable.' However, as noted by the [United States Patent and Trademark Office ("USPTO")], both our opinions and the Supreme Court's opinions over the years have established that § 101 challenges constitute validity and patentability challenges. *See also Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 453 (Fed. Cir. 1985); *Aristocrat*, 543 F.3d at 661 n.3.

It would require a hyper-technical adherence to form rather than an understanding of substance to arrive at a conclusion that § 101 is not a ground available to test patents under either the [Post Grant Review] or § 18 processes. Section 101 validity challenges today are a major industry, and they appear in case after case in our court and in Supreme Court cases, not to mention now in final written decisions in reviews under the [America Invents Act ("AIA")]. The numerous cases in our court and in the Supreme Court need no citation . . . .

It is often said, whether accurate or not, that Congress is presumed to know the background against which it is legislating. Excluding § 101 considerations from the ameliorative processes in the AIA would be a substantial change in the law as it is understood, and requires something more than some inconsistent section headings in a statute's codification. We agree with the USPTO and SAP and we so hold that, looking at the entirety of the statutory framework and considering the basic purpose of CBM reviews, the [Patent Trial and Appeal Board ("PTAB")] acted within the scope of its authority delineated by Congress in permitting a § 101 challenge under AIA § 18.

*Id.* at 1330. Of course, as RPost emphasizes, the *Versata* court decided a slightly different issue, i.e., the jurisdiction of a court to rule on a § 101 challenge brought under AIA § 18. *See id.* To that end, RPost contends that the statutory history of the AIA is different than that of the Patent Act, and thus argues that Congress did not specify § 101 as a "condition of patentability" for purposes of § 282 in *infringement* litigation. *See* (Doc. 299 at 8–13).

Similar to the Federal Circuit in *Versata*, the Court finds that a "hyper-technical adherence" to the section heading of § 101 is not enough to overcome decades of interpreting § 101 as a valid defense in patent infringement litigation. *See Lewis v. Hegstrom*, 767 F.2d 1371, 1376 (9th Cir. 1985) (noting that courts must not hinge "interpretation of a statute upon a single word or phrase but rather look to the statute as a whole, as well as its object and policies"); *see also Pa. Dep't of Corrs. v. Yeskey*, 524 U.S. 206, 212 (1998) ("The title of a statute . . . cannot limit the plain meaning of the text. For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase." (quotation omitted)). This is not a case where a mere sprinkling of district courts has incorrectly interpreted an infrequently-invoked statute or where a sharp divide exists in the judicial system. Indeed, the Supreme Court and Federal Circuit unwaveringly consider § 101 to be a viable and robust defense in the context of patent infringement litigation.[4] Whether couched as a "threshold test," *see Bilski*, 561 U.S. at 602, or a "condition of patentability," *see Aristocrat*, 543 F.3d at 661 n.3, it is firmly decided that the Court has jurisdiction to determine whether the Asserted Patents claim eligible subject matter under § 101, and RPost's reliance on § 101's section heading is not enough to create a "substantial change in the law as it is understood," *Versata*, 793 F.3d at 1330.

### c.      Conclusion

For the foregoing reasons, the Court concludes that it has jurisdiction to consider whether the Asserted Patents claim patent-eligible subject matter as required by § 101. Accordingly, the Court now turns to the merits of GoDaddy's § 101 argument.

### 2.      Legal Standard for § 101 Eligibility

As quoted above, § 101 of the Patent Act defines the subject matter eligible for

---

[4] In fact, during the pendency of these motions, the Federal Circuit has decided multiple cases where a party accused of patent infringement has invoked § 101 as a defense. *See, e.g.*, *In re TLI Commc'ns LLC Patent Litig.*, – F.3d –, 2016 WL 2865693, at *3 (Fed. Cir. May 17, 2016); *Enfish, LLC v. Microsoft Corp.*, – F.3d –, 2016 WL 2756255, at *4 (Fed. Cir. May 12, 2016).

patent protection as follows: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." § 101. "Issues of patent-eligible subject matter are questions of law" reserved exclusively to the Court. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1369 (Fed. Cir. 2011).

The Supreme Court, as noted above, has identified a two-part test for § 101 patent-eligibility in infringement litigation. *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1296–97). First, the Court must determine whether the claims at issue are directed to a patent-ineligible concept, i.e., "Laws of nature, natural phenomena, and abstract ideas." *Id.* (quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2116 (2013)). The term "abstract idea" embodies "the longstanding rule that an idea of itself is not patentable." *Id.* (citing *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). Not surprisingly, "precision has been elusive in defining an all-purpose boundary between the abstract and the concrete." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015); *see Versata*, 793 F.3d at 1331 (noting that the abstract ideas exception "is more of a problem, a problem inherent in the search for a definition of an 'abstract idea' that is not itself abstract").[5]

Nonetheless, several guiding principles emerge from Supreme Court and Federal Circuit precedent. For example, if the heart of the patent is a "fundamental economic practice," "conventional business practices," or a "method of organizing human activity" that has long been "prevalent in our system of commerce," then the patent is directed to an abstract idea. *Alice*, 134 S. Ct. at 2356; *see DDR Holdings LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1256 (Fed. Cir. 2014) (same). Moreover, concepts involving processes humans can perform without the aid of a computer, such as processes that can be done

---

[5] The Federal Circuit has strained for years to develop a coherent and consistent test for ascertaining what is or is not an "abstract idea." *See MySpace*, 672 F.3d at 1259 ("This effort to descriptively cabin § 101 jurisprudence is reminiscent of the oenologists trying to describe a new wine.").

1   mentally or using pen and paper, are generally directed to abstract ideas. *See, e.g.*,

2   *Content Extraction & Transmission LLC v. Wells Fargo Bank, N.A.*, 776 F.3d 1343, 1347

3   (Fed. Cir. 2014) (noting that "humans have always performed" the functions of

4   collecting, recognizing, and storing data); *CyberSource*, 654 F.3d at 1373 ("[A] method

5   that can be performed by human thought alone is merely an abstract idea and is not

6   patent-eligible under § 101."); *Gottschalk*, 409 U.S. at 67 (observing that the conversion

7   of binary numerals can be done mentally using a mathematical table). Notably, method

8   patents, like the ones at issue in this case, present "special problems in terms of

9   vagueness and suspect validity." *Bilski*, 561 U.S. at 608.

10      If the claims at issue are directed to a patent-ineligible concept, the Court must

11   then consider "what else" encompasses the claims to determine whether an "inventive

12   concept," i.e., "an element or combination of elements that is 'sufficient to ensure that the

13   patent in practice amounts to significantly more than a patent upon the [ineligible

14   concept] itself,'" exists. *Alice*, 134 S. Ct. at 2360 (quoting *Mayo*, 132 S. Ct. at 1298). The

15   Supreme Court has recognized that "[a]t some level, all inventions embody, use, reflect,

16   rest upon, or apply laws of nature, natural phenomenon, or abstract ideas." *Id.* at 2354

17   (citing *Diamond*, 450 U.S. at 187). Thus, only if an invention applies a patent-ineligible

18   concept towards a "new and useful end" will it remain eligible for patent protection. *Id.*

19   (citing *Gottschalk*, 409 U.S. at 67). To perform this analysis, the Court reviews "the

20   elements of each claim both individually and as an ordered combination to determine

21   whether the additional elements transform the nature of the claim into a patent-eligible

22   application." *Id.* (internal quotations omitted). Ultimately, the Court must "distinguish

23   between patents that claim the building blocks of human ingenuity and those that

24   integrate the building blocks into something more, thereby transforming them into a

25   patent-eligible invention." *Id.* (citing *Mayo*, 132 S. Ct. at 1303).

26      Notably, "[m]erely requiring a generic computer implementation fails to transform

27   [an] abstract idea into a patent-eligible invention." *Id.* at 2352; *see, e.g.*, *buySAFE, Inc. v.*

28   *Google, Inc.*, 765 F.3d 1350, 1354–55 (Fed. Cir. 2014) (noting that *Alice* "made clear that

a claim directed to an abstract idea does not move into § 101 eligibility territory by merely requiring generic computer implementation" (quotation omitted)); *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014) ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible."). If the claim purports to solve a problem arising only in the Internet context, the claim must be innovative enough to "override[] the routine and conventional" use of the computer. *DDR Holdings*, 773 F.3d at 1258–59.

### 3.   Burden of Proof

By statute, issued patents are "presumed valid." § 282(a). As the party challenging the validity of the Asserted Patents, GoDaddy bears the burden of proof. *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011). RPost argues that GoDaddy must meet this burden by setting forth "clear and convincing evidence" of patent ineligibility. (Doc. 299 at 14). GoDaddy, however, contends that "the usual presumption of validity does not apply" to issues of patent-eligibility. (Doc. 257 at 8).

While district courts have varied in their approaches when ruling on a validity challenge based on patent-eligibility, *see, e.g.*, *Broadband iTV, Inc. v. Oceanic Time Warner Cable, LLC*, 135 F. Supp. 3d 1175, 1180 (D. Haw. 2015) (declining to apply the presumption of validity but requiring clear and convincing evidence to prove underlying questions of fact); *Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 2015 WL 4203469, at *5 (D. Or. July 9, 2015) ("[T]he Court fails to see how the 'clear and convincing' standard applies to the validity analysis under Section 101 in this case."), and at least one Federal Circuit judge believes that "applying a presumption of eligibility is particularly unwarranted," *Ultramercial*, 772 F.3d at 720 (Mayer, J., concurring), neither the Supreme Court nor the Federal Circuit has issued a controlling decision designating which standard applies. Nonetheless, the Court finds it unnecessary to resolve this issue because even if the clear and convincing standard applied and the Asserted Patents were presumed eligible, the result of this case would be no different than if the preponderance of the evidence standard applied without a presumption of validity.

### 4.   Feldbau Patent[6]

The Feldbau Claims disclose a "method of authenticating" that a sender of a "dispatch" "electrically transmitted" it to a particular destination at a particular time and that it had a particular content. '219 Patent, col. 2 ll. 56–col. 3 ll. 14 (amended version).[7] The Feldbau Claims accomplish this objective by having the sender of the transmission "electrically transmit" the contents to a non-interested third party, i.e., "an authenticator." *Id.* at col. 2 ll. 63–67. The authenticator then "associates" information such as the time of the successful transmission and the dispatch's contents to "generate" data that "authenticate[s] the dispatch and the contents of the dispatch," i.e., "authentication data." *Id.* at col. 3 ll. 1–7. The authenticator must also "secure" the authentication data "against tampering." *Id.* at col. 3 ll. 8–10. In full, the Feldbau Claims recite as follows:

> **60**. A method of authenticating a dispatch and contents of the dispatch successfully transmitted from a sender to a recipient, comprising the steps of:
>
> receiving content data representative of the contents of the dispatch originated from the sender and being electrically transmitted to said recipient, and a destination of the dispatch;
>
> providing an indicia **[relating to]** *of* a time of *successful* transmission of the dispatch *to the recipient*, said time related indicia being *recorded by an authenticator and* provided in a manner resistant to or indicative of tampering by either of the sender and the recipient;
>
> associating, by **[an]** *the* authenticator functioning as a noninterested third party with respect to the sender and the recipient, the content data with dispatch record data which includes at least said time related indicia and an indicia related to the destination of the dispatch, to generate authentication data which authenticate the dispatch and the contents of the dispatch; and
>
> securing by said authenticator at least part of the authentication data against tampering of the sender and the recipient;

---

[6] The asserted claims of the Feldbau Patent are Claim Nos. 60, 62, 66, and 69. *See* (Docs. 258 at 12; 271-5 at 2; 300 at 10). These claims will be referenced herein as the "Feldbau Claims."

[7] In 2012, the Feldbau Patent underwent an Ex Parte Reexamination by the USPTO. *See* (Doc. 271-16 at 25). Several claims—including two of the claims asserted against GoDaddy in this case—were amended upon Reexamination. *See* (*id.* at 26). When citing to the reexamined patent, the Court will refer to it as the "amended version."

> wherein at least one of the steps of associating and securing utilizes mathematical association methods for a selected portion of a combination of the content data and the dispatched record data.

*Id.* at col. 2 ll. 56–col. 3 ll. 14 (amendments by Ex Parte Reexamination Certificate are shown in italics; deletions in bolded square brackets).

> **62**. A method according to claim **60**, further including the step of providing an output of at least part of the authentication data.

'219 Patent, col. 24 ll. 32–34.

> **66**. A method according to claim **60**, wherein the step of providing the time **[related]** indicia includes generating the time **[related]** indicia.

'219 Patent, col. 3 ll. 17–19 (amended version) (amendments by Ex Parte Reexamination Certificate are shown in italics; deletions in bolded square brackets).

> **69**. A method according to claim **60**, wherein the authentication data further includes a delivery indicia relating to said dispatch.

'219 Patent, col. 24 ll. 52–54.

To begin, the Court must determine whether the Feldbau Claims are drawn to a patent-ineligible concept, i.e., law of nature, natural phenomena, or abstract idea. *See Alice*, 134 S. Ct. at 2355. If so, the Court will then consider whether the claims add an "inventive concept" such that the ineligible concept transforms into a patent-eligible application. *Id.*

### a.    Step One: Patent-Ineligible Concept

GoDaddy argues that the Feldbau Claims are directed to the abstract idea of collecting and providing information about a dispatch and its contents using a third party intermediary. (Doc. 257 at 18). GoDaddy contends that the asserted claims simply apply "pure math" to accomplish its goals. (*Id.*) In response, RPost insists that the Feldbau Claims "address[] the specific technical problem of proving that specific information has been electronically sent at a specific time to a specific receiving party" by having an "authenticator [] generate authentication data which authenticate[s] the dispatch and the contents of the dispatch." (Doc. 299 at 20). RPost explains that the Feldbau Claims do not use "pure math" but apply "specific functions" performed by the authenticator. (*Id.*)

- 14 -

Although RPost's application of the Feldbau Claims may be phrased in its narrow, flowery rhetoric, the claim language is not nearly as particularized. Rather, the Feldbau Claims are directed to a general method of collecting and providing information about a dispatch using a third party intermediary. This is an abstract idea that has an extensive history dating back decades, if not centuries. For example, the Fedlbau Patent's specification posits that "[p]ost, courier, forwarding and other mail services, which enable people to exchange documents and data, have been widely used both in the past and at the present time." '219 Patent, col. 1 ll. 23–29. The specification further describes how third party intermediaries collect and provide certain information about a message in the modern world,

> Proof of delivery of non-electronic documents is provided, for example, by Registered Mail and courier services. It is commonly used to authenticate the delivery of materials at a certain time to a certain party, and serves as admissible proof of delivery in a court of law. However, no proof is provided as to the information contents of the specific dispatch.
>
> E-mail and other electronic messages forwarding services are commonly used today. The sender sends a message to the dispatching service which, in turn, forwards the message to the destination and provides the sender with a delivery report which typically includes the date and time of the dispatch, the recipient's address, the transmission completion status, and sometimes even the transmitted data, the number of pages delivered, the recipient's identification information, and so on. The provided delivery report mainly serves for accounting purposes and for notifying the sender of the dispatch and/or its contents. . . .

*Id.* at col. 2 ll. 26–44. Thus, the specification's own language details how the general concept at the heart of the Feldbau Claims is one that has been implemented for years.

Moreover, despite the possibility for a narrow application, the Court finds that the claimed idea is comparable to claims that the Supreme Court and Federal Circuit have determined to be drawn to abstract ideas. *See, e.g.*, *Gottschalk*, 409 U.S. at 71 (holding abstract and ineligible patent claims involving an algorithm for converting binary-coded decimal numerals into pure binary form); *Parker v. Flook*, 437 U.S. 584, 594–95 (1978) (holding abstract and ineligible a mathematical formula for computing "alarm limits" in a catalytic conversion process); *Alice*, 134 S. Ct. at 2360 (holding abstract and ineligible a

generalized computer method of intermediated settlement whereby two parties using a third-party intermediary exchange financial obligations); *Bilski*, 561 U.S. at 609 (finding that the concept of "hedging or protecting against risk" was drawn to an abstract idea); *buySAFE*, 765 F.3d at 1353, 1355 (finding that "transaction performance guaranty" was an abstract idea because the "narrowing of such long-familiar commercial transactions [to particular relationships] does not make the idea non-abstract for section 101 purposes"); *Digitech Image Techs. LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1348–51 (Fed. Cir. 2014) (holding that claims directed to digital image processing using math to combine data into a device profile were too abstract despite narrow application); *Intellectual Ventures I LLC v. Capital One Bank*, 792 F.3d 1363, 1367 (Fed. Cir. 2015) (holding that a method patent aimed at "tracking" and "storing" information was directed to patent-ineligible abstract idea of budgeting); *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S)*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) (holding that a method patent to track, reconcile, and administer life insurance policies was not drawn to patent eligible subject matter); *In re TLI Commc'ns*, 2016 WL 2865693, at *3 (concluding that claims directed to "classifying and storing digital images in an organized manner" were abstract and ineligible); *Content Extraction*, 776 F.3d.at 1347 (finding that claims directed to collecting, recognizing, and storing data were abstract and ineligible); *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x. 988, 991–92 (Fed. Cir. 2014) (concluding that concept of "using categories to organize, store, and transmit information" is an abstract idea).

Moreover, the Feldbau Claims are not directed to a specific improvement in computer functionality but simply recite conventional and generic technology to perform "generalized steps" in a well-known computer environment. *Enfish*, 2016 WL 2756255, at *4–5; *see In re TLI Commc'ns*, 2016 WL 2865693, at *3 (same). RPost's argument that the Feldbau Claims do not solely rely on "pure math" to "associat[e]" information is belied by a cursory review of the claim language. Particularly, the claims designate only one possible "association" or "securing" method: "mathematical association." '219

Patent, col. 3 ll. 11–14 (amended version). Beyond "mathematical association," the claims do not recite any other method for how the undefined "authenticator" is to associate or secure the data or detail what "mathematical association" method is to be applied. Even if the claim language did so, the claims would still be drawn to an abstract idea. *See Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations, such as consulting an activity log, add a degree of particularity, the concept embodied by the majority of the limitations describes only the abstract idea[.] ").

Furthermore, the method outlined in the Feldbau Claims is directed to a patent-ineligible "mental" process. The claimed "associating" and "securing" functions, "while 'primarily useful for computerized [applications],' could still be made [using a] pencil and paper." *Parker*, 437 U.S. at 586 (citations omitted). In fact, the Feldbau Claims are not even limited to an electronic embodiment. The only language plausibly requiring electronic implementation is "receiving content data representative of the contents of the dispatch originated from the sender and being electrically transmitted to said recipient, and a destination of the dispatch." '219 Patent, col. 2 ll. 59–62. However, whether the "sender" or "recipient"[8] "electrically transmit" a dispatch has no bearing on whether the *authenticator's* claimed functionality is restricted to an electronic embodiment.[9] To be sure, the specification teaches that the claimed authenticator-implemented functions of "associating" and "securing" can be performed *manually*. Particularly, Figure 1 illustrates as follows:

---

[8] The Court construed "sender" and "recipient" as requiring "computerized devices." (Doc. 219 at 101–03). Nonetheless, whether the "sender" and "recipient" require computerized devices has no bearing on the functionality of the *authenticator*, which is a separate and distinct third-party intermediary.

[9] At *Markman*, the parties stipulated that "authenticator" be construed as "a sub-system that operates to authenticate a dispatch." (Doc. 219 at 26). This construction does not necessarily limit the authenticator to an electronic embodiment.



**Fig. 1**

'219 Patent, Fig. 1. The specification defines Figure 1 as a "schematic pictorial illustration of the authentication method of the present invention implemented in a manual manner," *id.* at col. 4 ll. 45–47, and describes Figure 1 as follows:

> Reference is now made to FIG. **1** which illustrates the method of the present invention as it can be implemented for paper documents being sent non-electronically. The method of FIG. **1** can be implemented for documents sent via any document dispatching service, such as a courier service or the registered mail service of the post office.
>
> The sender **10** provides the documents **12** to be sent and a destination address **14** to a clerk **20** of the document dispatching service. The clerk **20** prepares a dispatch sheet **26**, which typically has a unique dispatch identifier (not shown) and has room for dispatch information such as the date and time of dispatch or delivery **16**, the destination address **14**, an indication **18** of proof of delivery such as the recipient's identity and/or signature, and optionally, additional dispatch information such as the dispatcher's signature and the identity of the sender.
>
> The clerk **20** fills in the dispatch sheet **26** with the date/time **16** and the address **14**, and then prepares a copy **24** of the documents **12** and a copy **34** of the dispatch sheet **26**, typically by utilizing a copy machine **22** or an electronic scanner. The clerk **20** then places the original documents **12** into an envelope **28** carrying the address **14**, and sends the envelope **28** to its destination **30**. In one embodiment of the present invention the dispatching service utilizes a cash-register like device to fill in the dispatch sheet **26**.

This provides for reliable time stamping and automated dispatch record keeping. *Furthermore, the electronic dispatch information produced by such device can be associated using a special mathematical method as discussed in greater detail below.*

*The clerk 20 associates the copy 24 of the documents 12 with the copy 34 of the dispatch sheet 26 by any method*, a few examples of which follow:

a) by inserting the documents copy **24** and the dispatch sheet copy 34 into an envelope **32**;

b) by inserting the copy **24** of the documents into an envelope **32** and marking the dispatch identifier on the outside of the envelope **32**;

c) by printing the dispatch identifier on the documents copy **24**; or

d) attaching the copies **24** and **34** and applying the stamp of the dispatch service in such a manner that part of the stamp is on the copy **24** of the documents and part of the stamp is on the copy **34** of the dispatch sheet **26**.

Preferably, the clerk **20** secures the copies **24** and **34** in a manner that makes it difficult to modify or replace the information contained therein, for example by marking the pages of the copy **24** with the dispatching service's signature, stamp or seal, by spreading each page with invisible or other ink, by sealing the envelope **32** or by retaining them in the service's secure file **36** and so forth.

*Id.* at col. 4 ll. 66–col. 5 ll. 50 (emphasis added); *see also id.* at col. 5 ll. 51–col. 6 ll. 30. Based on this language, it is indisputable that the Feldbau Claims are directed to a concept that can be performed manually.[10] Regardless, even if an electronic limitation for the claimed method existed, it would do little to limit the Feldbau Claims' expansive scope. The specification makes clear that the Feldbau Claims are not restrained to a particular application as they encompass "all types" of information, "all types" of dispatch methods, and "all types" of methods and devices for "associating" and "securing" the authentication data. *Id.* at col. 4 ll. 1–7 ll. 16–19. This lack of specificity underscores the abstract nature of the claims. *See Internet Patents*, 790 F.3d at 1348–49

---

[10] During oral argument, RPost attempted to distinguish Figure 1 as not being a pictorial representation of the "authenticator" because the specification does not expressly define it as such. This argument is unpersuasive. The specification unambiguously defines Figure 1 as an illustration of "the authentication method of the present invention." *Id.* at col. 4 ll. 45–47. There can be no dispute that the Feldbau Claims embody the "authentication method of the present invention."

(finding that claims were directed to abstract idea of maintaining computer state without recitation of specific activity used to generate that result).

Finally, RPost's argument that the Feldbau Claims "do not preempt all ways of accomplishing the alleged abstract idea," (Doc. 299 at 21), is not dispositive. The Federal Circuit confirmed that the simple fact that "the claims do not preempt all [methods of providing information about a dispatch] or may be limited to [such activity in the electronic] setting do not make them any less abstract." *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362–63 (Fed. Cir. 2015) (citing *buySAFE*, 765 F.3d at 1355).

For these reasons, the Court concludes that the Feldbau Claims, describing a method of collecting and providing information about a dispatch and its contents using a third-party intermediary, falls squarely within the "collection and organization of data" characterization deemed by the Federal Circuit to be abstract. *CyberSource*, 654 F.3d at 1370; *see, e.g.*, *YYZ, LLC v. Hewlett-Packard Co.*, 2015 WL 5886176, at *3 (D. Del. Oct. 8, 2015) ("Because computer software comprises a set of instructions, the first step of *Alice* is, for the most part, a given; i.e., computer-implemented patents generally involve abstract ideas."). Thus, the Feldbau Claims are directed to an abstract idea.

### b.      Step Two: Inventive Concept

Because the Feldbau Claims are drawn to a patent-ineligible concept, the Court must next consider whether the claims add an "inventive concept" that transforms the claims into a patent-eligible application. *See Alice*, 134 S. Ct. at 2355. The Court finds that beyond the abstract idea of collecting and providing information about a particular dispatch, the claims merely recite "well-understood, routine conventional activities," such as mathematical association or routine data-gathering and storing steps. *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294). Considered individually or taken together as an ordered combination, the claim elements fail to "'transform' the claimed abstract idea into a patent-eligible application." *Id.* at 2357 (quoting *Mayo*, 132 S. Ct. at 1294, 1298).

RPost insists that the Feldbau Claims disclose at least two inventive concepts: the "authenticator"-implemented steps of (1) associating content data with dispatch record

data to generate authentication data and (2) securing the authentication data. (Doc. 299 at 21–22). But beyond requiring that "at least one of the steps of associating and securing" be performed by an undefined "mathematical association method," the Feldbau Claims do not specify what type of mathematical association is performed or explain how the content data is associated with the dispatch record data in a manner that generates authentication data. *See* '219 Patent, col. 3 ll. 11–14 (amended version). Similarly, the unremarkable claim that the authentication data "authenticate[s] the dispatch and the contents of the dispatch," *id.* at col. 3 ll. 6–7, fails to explain what material comprises the authentication data.

Furthermore, the Feldbau Claims do not detail what the "authenticator" actually is or how the device secures the data against tampering beyond requiring "at least one of" the associating or securing steps be performed by an amorphous "mathematical association method." *Id.* at col. 3 ll. 11–14. Instead, the "authenticator" is loosely defined as "all types of apparatus" capable of performing the associating and securing functions, *see* '219 Patent, col. 4 ll. 16–19, and therefore is not tied to "a particular machine or apparatus," *Bilski*, 561 U.S. at 601. In other words, the Feldbau Claims broadly indicate what the "authenticator" *does*, but not what it *is*; this does not add "significantly more" to the abstract idea. *See Alice*, 134 S. Ct. at 2355 (citing *Mayo*, 132 S. Ct. at 1294).

Ultimately, the Court finds that the "associating" and "securing" "computer functions are 'well-understood, routine, conventional activit[ies]' previously known to the industry." *Id.* at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *OIP Techs.*, 788 F.3d at 1363 (holding that "sending a first set of electronic messages over a network to devices, the devices being programmed to communicate, storing test results in a machine-readable medium, and using a computerized system . . . to automatically determine an estimated outcome and setting a price" were conventional activities); *CyberSource*, 654 F.3d at 1373 ("[C]omputational methods which can be performed entirely in the human mind are

the types of methods that embody the 'basic tools of scientific and technological work' that are free to all men and reserved exclusively to none." (quoting *Gottschalk*, 409 U.S. at 67)). The Feldbau Claims merely "add" the generic computer functions of "associating" and "securing" to the claimed abstract idea of collecting and providing information about a particular dispatch. As explained above, these steps could be performed by humans without a computer as the only connection to an electrical embodiment concerns the sending of the message, not the functions of the authenticator. *See Mortg. Grader, Inc. v. First Choice Loan Servs. Inc.*, 811 F.3d 1314, 1324 (Fed. Cir. 2016) ("The series of steps covered by the asserted claims—borrower applies for a loan, a third party calculates the borrower's credit grading, lenders provide loan pricing information to the third party based on the borrower's credit grading, and only thereafter (at the election of the borrower) the borrower discloses its identity to a lender—could all be performed by humans without a computer."). This is not enough to constitute an inventive concept under *Alice*. *See DDR Holdings*, 773 F.3d at 1256 ("[A]fter *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible. The bare fact that a computer exists in the physical rather than purely conceptual realm is beside the point." (internal citations and quotation marks omitted)); *Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps does not make an invention patent-eligible.").[11]

Finally, nothing in the Feldbau Claims "purport[s] to improve the functioning of the computer itself," *Alice*, 134 S. Ct. at 2359, "effect an improvement in any other technology or technical field," *id.*; *see Enfish*, 2016 WL 2756255, at *4, or solve a problem unique to the Internet, *see DDR Holdings LLC*, 773 F.3d at 1257. The Feldbau Claims' method of converting input information (i.e., dispatch time, content, and destination data) to output information (i.e., authentication data) does not add

---

[11] In fact, the encryption and association methods described in the Feldbau Patent's specification are described as "widely used for security and for authentication purposes." '219 Patent, col. 2 ll. 9–18.

significantly more to the claimed abstract idea, *see Alice*, 134 S. Ct. at 2358, nor is it innovative enough to "override the routine and conventional" use of the computer, *see DDR Holdings*, 773 F.3d at 1258–59; *Enfish*, 2016 WL 2756255, at *7–8.

In sum, the Feldbau Claims are directed to the abstract idea of collecting and providing information about a particular dispatch and its contents using an unspecified "authenticator" that applies an undefined "mathematical association method" to "associate" and "secure" pre-existing information. These generic conventional activities—even if carried out by a computer—are not sufficient to pass the second step of *Alice. See, e.g.*, *Intellectual Ventures I*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." (quoting *Alice*, 134 S. Ct. at 2359–60)); *Digitech*, 758 F.3d at 1349–51 (holding ineligible a concept of gathering and combining data by reciting steps of organizing information through mathematical relationships where the gathering and combining merely employed mathematical relationships to manipulate existing information to generate additional information in the form of a "device profile" without limit to any use of the device profile).

### c.     Conclusion

For the foregoing reasons, the Court concludes that the Feldbau Claims are drawn to the abstract idea of collecting and providing information about a particular dispatch and fail to add "significantly more" such that an "inventive concept" "transforms" that idea into a patent-eligible application. *See Alice*, 134 S. Ct. at 2355. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that Feldbau Patent Claim Nos. 60, 62, 66, and 69 are invalid under § 101.

### 5.     Tomkow Patents

GoDaddy also contends that the Tomkow Patents claim patent-ineligible subject matter without adding inventive concepts to confer validity. (Doc. 257 at 10–14). In GoDaddy's view, the Tomkow Patents are all directed to the same abstract idea: "collecting and providing information for verifying transmission and/or delivery of a

message." (*Id.* at 14). GoDaddy argues that no inventive concept is added because the claims merely address conventional activities without solving a problem unique to the Internet. (*Id.* at 14–15).

RPost responds that the Tomkow Patents do not simply recite the collection and provision of generic information about a message but provide "specific" steps to verify the receipt of a message using "specific information." (Doc. 299 at 14). To that end, RPost argues that the Tomkow Patents provide a technical solution to a technical problem. (*Id.* at 17). RPost explains that "[t]he technical problem addressed by the Tomkow patents is providing reliable proof of content and delivery of electronic messages without requiring the co-operation of the recipient and without requiring special e-mail software," while the technical solution entails "using an intermediate server between a sender and receiver of an electronic message" to provide a "first information" or "authenticatible information." (*Id.* at 17–18). Thus, RPost insists that the inventive concept "does not lie in the computer hardware" or software but "in the technical features recited by the asserted claims." (*Id.* at 19).

As noted above, the Tomkow Patents are the '913, '104, '198, '199, and '389 Patents. These patents share a specification and are broadly described as "a system and method for verifying delivery and integrity of electronic messages." *See* '913 Patent, (54). Nonetheless, each Tomkow Patent describes a slightly different method to provide slightly different information, and thus, the Court will address each patent separately.

### a.        '913 Patent[12]

The '913 Patent Claims disclose "a system and method for verifying delivery and integrity of electronic messages" sent by a sender to a recipient through a server. *Id.* The '913 Patent Claims accomplish this goal by having the server record "some portion" of a mail transport protocol dialog, either Simple Mail Transport Protocol ("SMTP") or Extended Mail Transport Protocol ("EMTP"), in which a Mail Transport Agent ("MTA")

---

[12] The asserted '913 Patent claims are Claim Nos. 1 and 2. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'913 Patent Claims."

for the recipient accepts or declines delivery of the message. *Id.* at col. 27 ll. 48–54. In full, the '913 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient through a server acting as a Mail Transport Agent, including the steps at the server of:
>
> transmitting the message to the recipient's Mail Transport Agent in a protocol dialog selected from a group consisting of the selected one of the SMTP and ESMTP protocols; and
>
> recording at the server some portion of the selected one of the SMTP and ESMTP protocol dialog between the server and the recipient through the server including those portions of the selected one of the SMTP and ESMTP protocol dialog between the server and the recipient in which the receiving Mail Transport Agent accepts or declines delivery of the transmitted message
>
> **2**. The method as set forth in claim 1, including the step of:
>
> storing the recorded dialog in some form in which it may be associated with the message and the sender and the recipient of the message in such a way that it may be used to document the delivery history of the message from the sender to the recipient.

*Id.* at col. 27 ll. 41–60.

### i.        Step One: Patent-Ineligible Concept

The Court finds that the '913 Patent Claims are directed to the abstract idea of collecting information about the delivery of a message. Similar to the Feldbau Claims, the concept of collecting delivery information about a message has been practiced in various forms for decades, if not centuries. Most notably, the method disclosed by the '913 Patent Claims is essentially an electronic version of certified or registered mail that has long been implemented by the United States Postal Service ("USPS"). *See* '913 Patent, col. 1 ll. 33–37; (Docs. 258 at 5–8; 294 at 26).[13] In fact, the '913 Patent's

---

[13] To the extent RPost "objects" to GoDaddy's provision of historical references concerning USPS under Local Rule of Civil Procedure for the District Court of Arizona 7.2(m)(2), *see* (Doc. 299 at 22–23), the Court overrules the objection. Not only do the Tomkow Patents disclose that the patented subject matter attempts to mirror the services provided by USPS, *see, e.g.*, '219 Patent, col. 2 ll. 26–33; '913 Patent, col. 1 ll. 28–42, GoDaddy analyzed the USPS relationship during *Markman* briefing, *see, e.g.*, (Doc. 117 at 12), and disclosed the USPS connection in its invalidity contentions, *see* (Doc. 304-1 at

specification details how USPS and private mail carriers such as the United Parcel Service ("UPS") and Federal Express ("FedEx") provide "confirmation that [a] letter was successfully delivered to the addressee or the addressee's authorized agent." '913 Patent, col. 1 ll. 33–42. The shared-specification goes on to teach that the goal of the Tomkow Patents is to reach if not surpass the evidentiary heights of USPS-registered mail. *See id.* at col. 3 ll. 11–14. In other words, the heart of the '913 Patent Claims is directed to a "conventional business practice" that has long been "prevalent in our system of commerce." *Alice*, 134 S. Ct. at 2356.

Much of what RPost believes is pertinent under the first step of *Alice* is more applicable to the second step of the inquiry. For example, whether the '913 Patent Claims disclose "specific" or "defined" steps, *see* (Doc. 299 at 14), speaks to whether the claims add "something more" to transform the claimed concept into a patent-eligible application, not whether the concept itself is abstract. *See Ultramercial*, 772 F.3d at 715 ("We do not agree . . . that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into, something concrete. In any event, any novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis."). Being abstract does not mean that a concept is devoid of steps. Multi-step, computer-implemented method patents are frequently found ineligible as directed to abstract ideas. *See, e.g.*, *Digitech*, 758 F.3d at 1349–51; *Mortg. Grader*, 811 F.3d at 1324; *Internet Patents*, 790 F.3d at 1348–49. Here, although the '913 Patent Claims include "specific" steps, the steps are "generalized steps to be performed on a computer using conventional computer activity." *Enfish*, 2016 WL 2756255, at *7. The "heart" of a patent is determinative for *Alice* step one, *see Ultramercial*, 772 F.3d at 714, and as expressed above, the heart of the '913 Patent Claims is drawn to the abstract idea of collecting information about the delivery of a message.

RPost also argues that the numerous prior art references disclosed in the specification demonstrate that there is "no risk of preempting . . . the entire field of

4). The Court finds these disclosures are adequate.

creating a delivery receipt using tracking information." (Doc. 299 at 15–16). The Federal Circuit has soundly rejected this argument. In *Vehicle Intelligence & Safety LLC v. Mercedes-Benz USA, LLC*, the appellant argued that "the existence of prior art methods of equipment operator testing, evidenced by the eleven prior art references identified in the . . . specification, prove that the claims at issue do not preempt the abstract idea of performing equipment operator testing because these references describe non-infringing methods for doing so." 2015 WL 9461707, at *3 (Fed. Cir. Dec. 28, 2015). The Federal Circuit jettisoned this contention as "meritless" because "the mere existence of a non-preempted use of an abstract idea does not prove that a claim is drawn to patent-eligible subject matter." *Id.* The Federal Circuit explained that if it adopted such an approach, then "all a patentee would need do to insulate itself from a § 101 challenge would be to identify a single prior art reference in the specification and state that its invention improves upon that reference." *Id.*; *see also OIP Techs.*, 788 F.3d at 1362–63.

Furthermore, the tangible, physical components recited by the '913 Patent Claims "merely provide a generic environment in which to carry out the abstract idea" of collecting information about the delivery of a message. *In re TLI Commc'ns*, 2016 WL 2865693, at *3; *see ART+COM Innovationpool GmbH v. Google Inc.*, 2016 WL 1718221, at *4 (D. Del. Apr. 28, 2016) (finding that claim was drawn to "abstract idea of storing image data, then repeatedly requesting specific data, which is then stored and displayed"). The specification's emphasis that the present invention "relates generally to a system and method for verifying delivery and content of an electronic message," '913 Patent, col. 1 ll. 21–22, without requiring any "special e-mail software," *id.* at col. 2 ll. 67–col. 3 ll. 1, underscores that the '913 Patent Claims are directed to an abstract idea.

Finally, the Court finds that the concept of collecting information about the delivery of a message is no less abstract than any of the concepts the Supreme Court and Federal Circuit have determined to be drawn to abstract ideas. *See, e.g.*, *CyberSource*, 654 F.3d at 1370 ("collection and organization of data"); *Gottschalk*, 409 U.S. at 71 (algorithm for converting binary-coded decimal numerals into pure binary form); *Parker*,

437 U.S. at 594–95 (formula for computing "alarm limits" in a catalytic conversion process); *Alice*, 134 S. Ct. at 2360 (intermediated settlement whereby two parties using a third-party intermediary exchange financial obligations); *Bilski*, 561 U.S. at 609 ("hedging or protecting against risk"); *buySAFE*, 765 F.3d at 1353, 1355 ("transaction performance guaranty"); *Digitech*, 758 F.3d at 1348–51 (digital image processing using math to combine data into a device profile); *Intellectual Ventures I*, 792 F.3d at 1367 ("tracking" and "storing" information directed to abstract idea of budgeting).

For these reasons, the Court finds that the '913 Patent Claims merely "recite[] generalized steps to be performed on a computer using conventional computer activity," *Enfish*, 2016 WL 2756255, at *7 (citations omitted), and are directed to the abstract idea of collecting information about the delivery of a message.

### ii.    Step Two: Inventive Concept

Because the '913 Patent Claims are drawn to a patent-ineligible concept, the Court must now determine whether there is "significantly more" in the claims that "transforms" that concept into a patent-eligible application. *Alice*, 134 S. Ct. at 2355.

Claim 1 of the '913 Patent recites that a message is "transmitt[ed]" to the recipient's MTA and the server "record[s] some portion of the selected one of the SMTP and ESMTP protocol dialog," '913 Patent, col 27 ll. 48–49, while Claim 2 states that the server "stor[es] the recorded dialog," *id.* at col. 27 ll. 55–56. The '913 Patent Claims therefore invoke three computer-executed functions—"transmitting" information, "recording" information, and "storing" information—all of which can be implemented by "nearly every computer." *See Alice*, 134 S. Ct. at 2361 ("Nearly every computer [is] capable of performing . . . basic calculation, storage, and transmission functions."); *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."). As expressed above, the mere "recitation of generic computer limitations does not make an otherwise ineligible claim patent-eligible." *DDR Holdings*, 773 F.3d at 1256; *see Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps does not make an

invention patent-eligible."). Here, the Court finds that the disclosed steps of "transmitting," "recording," and "storing" pre-existing information are "computer functions [that] are 'well-understood, routine, conventional activit[ies]' previously known to the industry." *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1294); *see OIP Techs.*, 788 F.3d at 1363 (holding that "sending a first set of electronic messages over a network to devices, the devices being programmed to communicate, storing test results in a machine-readable medium, and using a computerized system . . . to automatically determine an estimated outcome and setting a price" were conventional activities).

RPost suggests "compelling evidence" exists that the '104, '389, and '913 Patents provide a "technical solution to a technical problem" because the PTAB denied petitions to institute CBM patent reviews of the three patents. (Doc. 299 at 18). The threshold standard for instituting a CBM review is whether it is "more likely than not" that a patent is un-patentable. 35 U.S.C. § 324(a). A CBM patent excludes patents for "technological inventions," i.e., patents that claim "a technological feature that is novel and obvious over the prior art; and solves a technical problem using a technical solution." 37 C.F.R. § 42.301(b). Regarding the '913 Patent, the PTAB denied the petitioner's request because the "conclusory language in the petition that none of the steps of a claim requires any novel and unobvious technological implementation, or solves a technical problem, without more, is not sufficient to demonstrate that the claimed subject matter is not a technical invention." (Doc. 304-5 at 10). The PTAB also faulted the petitioner for failing to "analyze[] the method steps separately, instead of examining each claim as a whole, as required" to determine whether the patent is a technological invention. (*Id.*)[14]

The Court has analyzed the '913 Patent Claims as a whole and concludes that no "inventive concept" is recited, nor do the claims purport to solve a technical problem using a technical solution. Instead, the claimed steps are conventional activities that "nearly every computer" can perform. *Alice*, 134 S. Ct. at 2361. To the extent RPost

---

[14] The PTAB applied similar reasoning for the '104 and '389 Patents. *See* (Docs. 304-3 at 9–10; 304-4 at 9–10).

argues that the '913 Patent Claims solve a problem "necessarily rooted in computer technology" as illustrated in *DDR Holdings*, *see* (Doc. 299 at 17), that argument fails for two reasons. First, nothing in the claim language is innovative enough to "override[] the routine and conventional" use of the computer. *Enfish*, 2016 WL 2756255, at *7–8; *DDR Holdings*, 773 F.3d at 1258–59. In fact, the generalized steps of the '913 Patent Claims *are* routine and conventional. Second, the problem purportedly addressed by the '913 Patent Claims is not "necessarily rooted in computer technology" as explained by *DDR Holdings*. The "problem" of verifying the delivery of a message has long troubled mail delivery systems, and the facile fact that the '913 Patent Claims are drawn to electronic mailing is of no consequence. *See, e.g.*, *Alice*, 134 S. Ct. at 2361; *buySAFE*, 765 F.3d at 1355. Ultimately, the claims are "recited too broadly and generically to be considered sufficiently specific and meaningful applications of their underlying abstract ideas." *DDR Holdings*, 773 F.3d at 1256; *see also Internet Patents*, 790 F.3d at 1348 (finding patent ineligible where claim "contain[ed] no restriction on how the result [was] accomplished"). Accordingly, RPost's "rooted in computer technology" and "technical solution to technical problem" arguments do not furnish the necessary "inventive concept" to confer patent-eligibility.

### iii.    Conclusion

For the foregoing reasons, the Court concludes that the '913 Patent Claims are directed to the abstract idea of collecting information about the delivery of a message and fail to add an "inventive concept" that "transforms" the idea into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '913 Patent Claim Nos. 1 and 2 are invalid under § 101.

### b.    '104 Patent[15]

The '104 Patent Claims disclose a method of providing information about the

---

[15] The asserted '104 Patent claims are Claim Nos. 1, 9, 27, 32. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'104 Patent Claims."

opening of an electronic message sent from a sender to a recipient through a server. *See* '104 Patent, col. 27 ll. 63–col. 28 ll. 16, col. 31 ll. 20–37. To accomplish this goal, the server "add[s] a link" to the electronic message that executes when the message is opened at the recipient to provide the server an indication that the message has been opened. *Id.* Pursuant to Claim 1, the server then "provid[es] an authenticatible information" related to the message, *id.* at col. 27 ll. 10–11, while under Claim 27, the server "constructs authenticatible information" and "transmits" the "indication of opening" and "authenticatible information" to the sender or originating processor, *id.* at col. 31 ll. 33–37. In full, the '104 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:
>
> receiving the message at a server from the sender, the server being displaced from the recipient,
>
> adding a link to the message by the server, the link configured to execute when the message is opened at the recipient to provide an indication that the message has been opened by the recipient,
>
> transmitting the message and the link from the server to the recipient,
>
> executing the link when the message is opened at the recipient to control the server to provide an indication that the message has been opened at the recipient,
>
> providing an authenticatible information related to the message, including the indication of the opening of the message at the recipient, at the server,
>
> transmitting the indication of the opening of the message at the recipient, and the authenticatible information from the server to the sender.

*Id.* at col. 27 ll. 63–col. 28 ll. 16.

> **9**. The method of claim **1**, wherein transmitting the authenticatible information includes transmitting a representation of the message.

*Id.* at col. 28 ll. 49–51.

> **27**. A system for transmitting a message from an originating processor to a recipient processor in an electronic mail system and providing an indication that the message was opened by the recipient processor, comprising:

a server in electronic communication in the electronic mail system, the server receiving the message from the originating processor and adding a link to the message before transmitting the message and link to the recipient processor, the link being configured to execute automatically when the message is opened at the recipient processor to control the server to provide an indication at the server that the message has been opened at the recipient processor; and

wherein the server constructs authenticatible information related to the message; and

wherein the server transmits the indication of the opening of the message at the recipient processor and the authenticatible information to the originating processor.

*Id.* at col. 31 ll. 20–37.

**32**. The system of claim **27**, wherein the server transmits the indication of the opening of the message at recipient processor and the authenticatible information to the originating processor in a secure, verifiable manner.

*Id.* at col. 32 ll. 1–4.

### i.      Step One: Patent-Ineligible Concept

Similar to the '913 Patent Claims, the Court finds that the '104 Patent Claims are directed to the abstract idea of collecting and providing information about the opening of a message. The minor variation between the concepts—message "delivery" and message "opening"—is inconsequential. Rather, the concept at the heart of the '104 Patent Claims is directed to a generic idea that has been implemented in the electronic messaging industry for years. For example, the '104 Patent's specification recites that,

Many existing e-mail systems and e-mail programs already provide for some form of proof of delivery. For instance, some e-mail systems today allow a sender to mark a message with 'request for notifications' tags. Such tags allow a sender to request notification that the message was delivered and/or when the message was opened. When a sender requests delivery notification, the Internet e-mail system may provide the sender with an e mail receipt that the message was delivered to the mail server or the electronic inbox of the recipient. The receipt message may include the title of the message, the destination address, and the time of delivery. It may also include (depending on the types of "flags" that are provided and activated in the mailing software) a list of all the Internet "stations" that the message passed through en route to its destination. This form of reporting is

built into some of the rules and protocols which implement e-mail. Furthermore, when a message is sent with a 'read notification' request, the recipient's email program may send to the sender an e-mail notification that the recipient opened that message for reading. Many electronic mail clients can and do support this kind of reporting; however, Internet protocols do not make it mandatory.

*Id.* at col. 1 ll. 41–62; *see* (Doc. 271-17 at 10) (portion of Dr. Terrance Tomkow's deposition describing pre-existing process of adding links to electronic messages that provide "read notifications" when activated at the recipient).

Furthermore, the concept of collecting and providing information about the opening of a message is analogous to other data collection and tracking methods deemed by courts to be drawn to abstract ideas. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347 (holding that a patent for reading and processing the data on checks was directed to the abstract idea of "data collection, recognition, and storage," processes that are "undisputedly well-known"); *Wireless Media Innovations v. Maher Terminals*, 100 F. Supp. 3d 405, 413 (D.N.J. 2015) (concluding that concept of "monitoring locations, movement, and load status of shipping containers . . . and storing, reporting and communicating this information in various forms through generic computer functions" was too abstract for patent-eligibility); *YYZ*, 2015 WL 5886176, at *7 (finding that apparatus and method for "measuring, monitoring, tracking, and simulating enterprise or business communications and processes in an asynchronous messaging environment" was directed to an abstract idea); *Neochloris, Inc. v. Emerson Process Mgmt. LLLP*, 2015 WL 5951753, at *4–5 (N.D. Ill. Oct. 13, 2015) (holding that claims describing process of collecting data, transmitting data to computer, monitoring data using computer and software, and sending alarms when problems arise, were directed to abstract idea).

RPost's contention that the '104 Patent Claims are not directed to an abstract idea because they can verify the opening of a message without the recipient's cooperation or compliance is unpersuasive. At their core, the '104 Patent Claims simply provide information that a particular message was opened. Whether or not the '104 Patent Claims require the recipient's "cooperation" speaks not to whether the idea is abstract but to

whether the claims add an inventive concept, i.e., the second step in the *Alice* paradigm. *See Ultramercial*, 772 F.3d at 715 ("We do not agree . . . that the addition of merely novel or non-routine components to the claimed idea necessarily turns an abstraction into, something concrete. In any event, any novelty in implementation of the idea is a factor to be considered only in the second step of the *Alice* analysis.").

Similarly, RPost's argument that the '104 Patent Claims are not directed to an abstract idea because they require "specific" steps to verify the opening of a message via a tangible "intermediate server that records" and "forms" certain information is beside the point; the claims merely recite the abstract idea of collecting and providing information about the opening of a message. *See Alice*, 134 S. Ct. at 2358 ("The fact that a computer necessarily exist[s] in the physical, rather than purely conceptual, realm . . . is beside the point."). The Federal Circuit recently explained that a relevant inquiry at the first step of *Alice* is to "ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea." *Enfish*, 2016 WL 2756255, at *4. Specifically, *Enfish* contrasted claims "directed to an improvement in the functioning of a computer" with claims "simply adding conventional computer components to well-known business practices," or claims reciting "use of an abstract mathematical formula on any general purpose computer," or "a purely conventional computer implementation of a mathematical formula," or "generalized steps to be performed on a computer using conventional computer activity." *Id.* at *4–5; *see In re TLI Commc'ns*, 2016 WL 2865693, at *3 (same). Here, the '104 Patent Claims are not directed to a specific improvement in computer functionality, but use conventional and generic technology to perform "generalized steps" in a well-known environment. To be sure, the disclosed "server" is indisputably not new,[16] and the added "link" is nothing more than a standard

---

[16] RPost admits as much in its opposition to summary judgment. *See* (Doc. 299 at 19) ("The inventive concept of the asserted claims does not lie in the computer hardware."). Furthermore, the server is described simply in terms of performing generic computer functions such as transmitting, receiving, and storing data. *See* '104 Patent, col. 27 ll. 63–col. 28 ll. 16, col. 31 ll. 20–37. But these functions are described in vague terms

hyperlink configured to execute at a certain time,[17] which certainly is not inventive.

Finally, the '104 Patent Claims do not solve "a challenge particular to the Internet." *DDR Holdings*, 773 F.3d at 1256–57. As explained above, the problem purportedly "solved" by the Tomkow Patents was long prevalent in the pre-Internet, analog world, and there is nothing unique to the Internet about collecting and providing information about the opening of a message. Despite RPost's endeavors to describe the '104 Patent Claims as performing "specific" steps to provide "specific" information, the claim language divulges nothing more than the process of transmitting a message, adding a link to the message, and storing information about the message. These are all abstract ideas individually, and in ordered combination, the steps recite an abstraction—an idea, having no particular concrete or tangible form; namely, a method of receiving and transmitting electronic messages and collecting the relevant data as to the opening of the message. *See Ultramercial*, 772 F.3d at 715 ("Although certain additional limitations, such as consulting an activity log, add a degree of particularity, the concept embodied by the majority of the limitations describes only [an] abstract idea.").

For these reasons, the Court finds that, like the claims at issue in *Content Extraction* which were directed to "collecting data," "recognizing certain data within the collected data set," and "storing the recognized data in memory," 776 F.3d at 1347, collecting and providing information about the opening and delivery of a message is a well-established "basic concept" that is patent-ineligible under *Alice* step one.

### ii.    Step Two: Inventive Concept

RPost insists that the '104 Patent Claims add an inventive concept to the abstract idea because after "receiving" the message, the server adds a link that is "configured to execute" upon opening of the message, thereby generating an "indication" that the

---

without any meaningful limitations and thus, the "focus of the patentee and of the claims was not on an . . . improved server." *In re TLI Commc'ns*, 2016 WL 2865693, at *4.

[17] At *Markman*, the Court construed the claim term "link" by its plain and ordinary meaning because it needed no clarification or explanation. (Doc. 219 at 35–36).

message was opened. (Doc. 299 at 18). RPost claims that evidence of an inventive concept is seen by the server "transforming" the indication into something more, i.e., "authenticatible information." (*Id.*) According to RPost, the inventive concept resides in these "technical features" which enable a sender to verify the opening of a message without the recipient's "cooperation" or "compliance." (*Id.* at 18–19).

To begin, "links" or "tags" have been added to electronic messages for decades. As the '104 Patent's specification teaches, "read notifications" and "request for notification" tags have long been appended to electronic messages and are commonplace in the electronic messaging industry. *See* '104 Patent, col. 1 ll. 41–62. Moreover, Dr. Tomkow testified that the concept of inserting hyperlinks into e-mail was well-known before the Tomkow Patents, *see* (Doc. 294 at 30–31), as were Internet links and hyperlinks, *see* (*id.*; Doc. 271-17 at 10). Thus, merely adding a "link" to a message is not inventive. *See Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1344 (Fed. Cir. 2013) (finding that the use of "hypertext" to communicate information "was a routine incorporation of Internet technology into existing processes").

Similarly, the claimed "server" "fail[s] to add an inventive concept sufficient to bring the abstract idea into the realm of patentability." *In re TLI Commc'ns.*, 2016 WL 2865693, at *5. "For the role of a computer in a computer-implemented invention to be deemed meaningful in the context of [the inventive concept] analysis, it must involve more than performance of 'well-understood, routine, [and] conventional activities previously known in the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (quoting *Alice*, 134 S. Ct. at 2359). Here, the server merely "receives" a message, "adds" a link to the message, and "transmits" the message. These steps fall squarely within Supreme Court and Federal Circuit precedent finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea. *See, e.g.*, *id.* at 1345, 1348 (holding that "storing information" into memory and using a computer to "translate the shapes on a physical page into typeface characters" was insufficient to confer patent eligibility); *Alice*, 134 S. Ct. at 2361 ("Nearly every computer will include a

'communications controller' and a 'data storage unit' capable of performing the basic calculation, storage, and transmission functions required by the method claims."); *buySAFE*, 765 F.3d at 1355 ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive."); *Mortg. Grader*, 811 F.3d at 1324–25 (holding that claimed components "interface," "network," and "database" were merely "generic computer components" insufficient to confer eligibility); *Intellectual Ventures I*, 792 F.3d at 1368 (finding that claimed components "database," "user profile," and "communication medium" did not confer eligibility).

To the extent RPost argues that the link itself is "inventive" because it is "configured to execute when the message is opened" thereby removing the need for recipient "cooperation," *see* (Doc. 299 at 18), the Court disagrees. A component that "can be configured" to perform a claimed function—without more—is neither sufficiently described nor sufficiently innovative to transform an abstract idea into patent-eligible subject matter. *See Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1008–09 (Fed. Cir. 2014) (rejecting argument that unclaimed features are relevant for patent-eligibility purposes). Thus, to broadly claim a method of accomplishing a routine function requires more than just an "apply it" directive, even if in a specific technical environment. *See, e.g.*, *Alice*, 134 S. Ct. at 2358 ("[I]f a patent's recitation of a computer amounts to a mere instruction to implement an abstract idea on . . . a computer, . . . that addition cannot impart patent eligibility." (citing *Mayo*, 132 S. Ct. at 1301)); *Intellectual Ventures I*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." (quoting *Alice*, 134 S. Ct. at 2359–60)).

Equally unpersuasive is RPost's thin argument that the '104 Patent Claims' "transform[ation]" of the "indication" into "authenticatible information" signals an inventive concept. The Federal Circuit has held that the machine-or-transformation test can provide a "useful clue" during the second step of the *Alice* framework. *See Bancorp Servs.*, 687 F.3d at 1278. Thus, a claimed process can be patent-eligible under § 101 if:

"(1) it is tied to a particular machine or apparatus, or (2) it transforms a particular article into a different state or thing." *In re Bilski*, 545 F.3d 943, 954 (Fed. Cir. 2008) (en banc), *aff'd on other grounds by Bilski*, 561 U.S. 593. In this case, the claim language does not substantiate RPost's contention that the "indication" is "transformed" into "authenticatible information." Rather, the claim language simply recites that the server "provid[es] an authenticatible information related to the message, including the indication of the opening of the message," '104 Patent, col. 28 ll. 10–12, and "constructs authenticatible information," *id.* at col. 31 ll. 33–34. The claim language does not disclose or even imply that the "indication" is in any way "transformed."[18] RPost's argument is therefore flawed from the start.[19] Even if the "indication" was "transformed" into "authenticatible information," the '104 Patent Claims still do not disclose any details as to *how* the "transformation" transpires, nor do they inform that the "transformed" product, i.e., "authenticatible information," is anything more than the general, pre-existing "indication." Such free-standing information is simply not patentable. *See Digitech*, 758 F.3d at 1350 ("Data in its ethereal, non-physical form is simply information that does not fall under any of the categories of eligible subject matter.").

As was the case in *Alice*, the Court finds that "the function performed by the computer at each step of the process is '[p]urely conventional.'" *Alice*, 134 S. Ct. at 2359 (quoting *Mayo*, 132 S. Ct. at 1298). Simply narrowing an abstract idea implemented by pre-existing components to a particular technological environment is insufficient to pass

---

[18] This is in contrast to the '389 and '199 Patent Claims which, as discussed below, disclose that a "first information" is "form[ed] . . . *from*" a particular indication and certain other information.

[19] In fact, the claim language implies the *opposite* of RPost's argument. Namely, the '104 Patent Claims disclose that at the end of the claimed process, the server transmits the "indication of the opening of the message . . . *and* the authenticatible information" to the sender. *Id.* at col. 28 ll. 14–16, col. 31 ll. 35–37 (emphasis added). Pragmatically, there would be no reason to provide the sender with *both* pieces of information if they included the *same* information. Thus, this suggests that the "authenticatible information" is formed from other, non-claimed information.

muster under § 101. *See, e.g., Digitech*, 758 F.3d at 1348–51 (holding that claims directed to digital image processing using math to combine data into a device profile were too abstract despite narrow application); *Planet Bingo*, 576 F. App'x at 1009 (finding that claims failed to add an inventive concept to abstract idea because the claims merely "recite a program that is used for the generic functions of storing, retrieving, and verifying a chosen set of bingo numbers against a winning set of bingo numbers"). The § 101 inquiry is focused on the claim language and whether the ordered combination of the limitations disclose patent-eligible subject matter or add an inventive concept to an abstract idea. Here, the '104 Patent Claims fail to recite any elements that individually or as an ordered combination transform the abstract idea of collecting and providing information about the opening of a message into a patent-eligible application.

### iii.    Conclusion

For these reasons, the Court concludes that the '104 Patent Claims are directed to the abstract idea of collecting and providing information about the opening of a message and fail to add an inventive concept to confer patent eligibility. *Alice*, 134 S. Ct. at 2355. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '104 Patent Claim Nos. 1, 9, 27, and 32 are invalid under § 101.

### c.    '198 Patent[20]

The '198 Patent, a continuation of the '104 Patent, claims a method of providing information about the opening and delivery of an electronic message sent from a sender to a recipient through a server. *See* '198 Patent, col. 28 ll. 6–25, col. 29 ll. 11–27, col. 30 ll. 7–25. To achieve this goal, a server adds a link to the electronic message that is "configured to execute when the link is activated at the recipient" to provide the server an indication that the message has been opened or delivered. *Id.* The server then forms "authenticatible information" relating to the message, which includes the indication of

---

[20] The asserted '198 Patent claims are Claim Nos. 1, 6, 7, 10, 18, 23, 32, 35. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'198 Patent Claims."

opening or delivery, and transmits the "authenticatible information" to the sender. *Id.* In full, the '198 Patent Claims recite as follows:

**1**. A method of transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:
receiving the message at a server from the sender, the server being displaced from the recipient,
associating a link with the message by the server, the link configured to execute when the link is activated at the recipient to provide an indication that the message has been opened by a recipient,
transmitting the message and the link from the server to the recipient,
executing the link when the link is activated at the recipient to control the server to provide an indication that the message has been delivered to the recipient,
providing an authenticatible information related to the message, including the indication of the delivery of the message at the recipient, at the server, and
transmitting the indication of the delivery of the message at the recipient, and the authenticatible information from the server to the sender.

*Id.* at col. 28 ll. 6–25.

**6**. The method of claim **1**, wherein the link is activated at the recipient to provide an indication that the message has been opened by the recipient.
**7**. The method of claim **6**, wherein the indication of the opening of the message at the recipient, and the authenticatible information are stored in a memory.

*Id.* at col. 28 ll. 39–44.

**10**. The method of claim 1, wherein the indication of the delivery of the message, and the authenticatible information are stored in a memory.

*Id.* at col. 28 ll. 50–53.

**18**. A system transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:
a server in electronic communication with the sender and the receiver, the server programmed to receive a message from the sender, to associate a link with the message, the link configured to execute when the link is activated at the recipient to provide an indication that the message

- 40 -

has been opened by a recipient, to transmit the message and the link from the server to the recipient, wherein

   the link is executed when the link is activated at the recipient to control the server to provide an indication that the message has been opened at the recipient, and

   wherein the server is programmed to form an authenticatible information related to the message, and to transmit the indication of the opening of the message at the recipient and the authenticatible information from the server to the sender.

*Id.* at col. 29 ll. 11–28.

   **23**. The system of claim **18**, wherein the indication of the opening of the message at the recipient, and the authenticatible information are stored in a memory.

*Id.* at col. 29 ll. 41–43.

   **32**. A system transmitting a message from a sender to a recipient and providing an indication that the message was opened by the recipient, comprising:

   a server in electronic communication with the sender and receiver, the server programmed to receive a message from the sender, to associate a link with the message, the link configured to execute when the link is activated at the recipient to provide an indication that the message has been delivered to a recipient, to transmit the message and the link from the server to the recipient, wherein

   the link is executed when the link is activated at the recipient to control the server to provide an indication that the message has been delivered to the recipient; and

   wherein the server is programmed to form an authenticatible information related to the message, and to transmit the indication of the delivery of the message to the recipient and the authenticatible information from the server to the sender.

*Id.* at col. 30 ll. 7–25.

   **35**. The system of claim **32**, wherein the indication of the delivery of the message to the recipient, and the authenticatible information are stored in a memory.

*Id.* at col. 30 ll. 31–33.

### i.      Step One: Patent-Ineligible Concept

   As a continuation of the '104 Patent, the '198 Patent incorporates the same features and components as its parent, such as a "server," a "link," a "message," an

"MTA," a "recipient," a "sender," and "memory." Also similar is the general concept of the '198 Patent. Like the '104 Patent Claims, the '198 Patent Claims disclose a method of providing information about the opening of a message. And like the '913 Patent Claims, the method described in the '198 Patent Claims also provides information about the delivery of a message, albeit via activation of a link.

Because there is no practical difference between the concepts of these three patents, the Court finds that the '198 Patent Claims are directed to the same abstract ideas as the '913 and '104 Patent Claims, to wit, collecting and providing information about the opening and delivery of a message. Consequently, for the reasons expressed above, the Court finds that the '198 Patent Claims are directed to the patent-ineligible abstract idea of collecting and providing information about the opening and delivery of a message.

### ii.      Step Two: Inventive Concept

Likewise, for the reasons detailed above regarding the '913 and '104 Patent Claims, the Court concludes that the '198 Patent Claims fail to add "significantly more" to the claimed abstract idea such that the idea is "transformed" into a patent-eligible application. *Alice*, 134 S. Ct. at 2355. The functions recited by the '198 Patent Claims, e.g., receiving a message, transmitting a message, adding a link, and storing information using pre-existing components, are "conventional activities" that "nearly every computer" can perform. *Id.* at 2361. Thus, because "[i]nstructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible," *Intellectual Ventures I*, 792 F.3d at 1368 (quoting *Alice*, 134 S. Ct. at 2359–60), the Court concludes that the '198 Patent Claims do not add an inventive concept to the abstract idea.[21]

---

[21] Additionally, the '198 Patent Claims recite that the "associated" link executes "when activated at the recipient." '198 Patent, col. 28 ll. 17–19. Unlike the '104 Patent Claims, the '198 Patent Claims do not indicate *when* this activation takes place or *how* the link is activated. Rather, the link simply executes when it is activated, thereby causing the '198 Patent Claims to be even more opaque than the '104 Patent Claims.

### iii.    Conclusion

For the foregoing reasons, the Court finds that the '198 Patent Claims are directed to the abstract idea of collecting and providing information about the delivery and opening of a message and fails to add an inventive concept sufficient to confer patent eligibility. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '198 Patent Claim Nos. 1, 6, 7, 10, 18, 23, 32, and 35 are invalid under § 101.

### d.    '389 Patent[22]

The '389 Patent discloses a "system and method of verifying delivery and integrity of electronic messages." '389 Patent, (54). Like the '913 Patent Claims, the '389 Patent Claims attain this goal by using a server that receives a portion of a mail transport protocol dialog generated by the transmission of the message from the server to the recipient and an indication that the recipient has received the message. *Id.* at col. 27 ll. 58–67. The server then "form[s]" a "first information" from this data and "transmit[s]" it to the sender. *Id.* at col. 28 ll. 1–7. In full, the '389 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient through a server displaced from the recipient, the steps at the server comprising:
> receiving the message at the server from the sender;
> transmitting the message to the recipient;
> receiving at the server at least a portion of a mail transport protocol dialog generated during transmission of the message from the server to the recipient;
> receiving at the server from the recipient an indication of the receipt of the message by the recipient;
> forming at the server a first information from the at least a portion of the mail transport protocol dialog and the indication of the receipt of the message by the recipient; and
> transmitting, before any authentication of the message, a copy of the message and the first information to the sender from the server.

---

[22] The asserted '389 Patent claims are Claim Nos. 1, 7, 12, 14, and 15. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'389 Patent Claims."

*Id.* at col. 27 ll. 58–col. 28 ll. 7.

>       **7**. A system for transmitting a message through an electronic mail system from an originating processor to a recipient processor and providing proof of receipt of the message by the recipient processor, comprising:
>       a server displaced from the originating processor, the server capable of being configured by software commands to:
>       receive a message from the originating processor and to transmit the message to the recipient processor;
>       receive an indication of receipt of the message from the recipient processor and a mail transport protocol dialog generated by the electronic mail system during transmission of the message from the server to the recipient processor;
>       generate a first information including the indication of receipt of the message from the recipient processor and at least a portion of the mail transport protocol dialog generated by the electronic mail system during transmission of the message from the server to the recipient processor.

*Id.* at col. 28 ll. 33–52.

>       **12**. The system of claim **7**, further comprising a memory and wherein the server is further configured to store a copy of the message and the first information to the originating processor in the memory before any authentication of the message by the server.

*Id.* at col. 29 ll. 8–12.

>       **14**. A method of transmitting a message from a sender to a recipient through a server displaced from the recipient, the steps at the server comprising:
>       receiving the message at the server from the sender, transmitting the message to the recipient;
>       receiving at the server from the recipient a first information including an indication of the receipt of the message by the recipient and at least a portion of a generated during transmission of the first information from the server to the recipient; and
>       storing a representation of the message and the first information received by the server from the recipient in a memory, before any authentication of the message.
>       **15**. The method of claim **14**, further comprising:
>       transmitting the representation of the message and the first information received by the server from the recipient to the sender from the server, before any authentication of the message.

*Id.* at col. 29 ll. 16–col. 30 ll. 13.

- 44 -

### i.   Step One: Patent-Ineligible Concept

Like the '913, '104, and '198 Patent Claims, at the heart of the '389 Patent Claims is the general concept of collecting and providing information about a particular message, which is similar to methods of "tracking," "monitoring," and "data collection," that courts have deemed to be directed to abstract ideas. *See, e.g.*, *Content Extraction*, 776 F.3d at 1347–48 ("data collection, recognition, and storage"); *Wireless Media Innovations*, 100 F. Supp. 3d. at 413 ("monitoring locations, movement, and load status . . . and storing, reporting and communicating this information in various forms through generic computer functions"); *YYZ*, 2015 WL 5886176, at *7 ("measuring, monitoring, tracking, and simulating enterprise or business communications and processes in an asynchronous messaging environment"); *Neochloris*, 2015 WL 5951753, at *4–5 ("collecting," "transmitting," and "monitoring" data). Consequently, the Court finds that the '389 Patent Claims are directed to the abstract idea of collecting and providing information about the receipt of a message.

### ii.   Step Two: Inventive Concept

RPost contends that the '389 Patent Claims add an inventive concept because they recite "specific ways to verify delivery of an electronic message using specific information." *See* (Doc. 299 at 14). Particularly, RPost explains that the claims require the server to receive a "portion of a transport protocol dialog generated between the server and a recipient during transmission of an electronic message" and an "indication of receipt" of the message from the sender in order to "form" and "transmit" a "first information" to the sender. *Id.*

Arguing that something is specific does not make it so. To be sure, underpinning RPost's "specifics" is "the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *DDR Holdings*, 773 F.3d at 1257. This is not a case where the claims are directed to "a problem specifically arising in the realm of computer technology." *DDR Holdings*, 773 F.3d at 1257. Rather, the problem of verifying the receipt of a message existed in the pre-

Internet, analog world, and the '389 Patent Claims simply disclose a process "for which computers are invoked merely as a tool." *Enfish*, 2016 WL 2756255, at *5.

Moreover, "whether or not [RPost] has added that special 'something more' to this conventional business practice is determined by the quality, not the quantity, of its specific adornments and limitations." *Mobile Telecomms. Techs., LLC v. United Parcel Serv., Inc.*, 2016 WL 1171191, at *7 (N.D. Ga. Mar. 24, 2016). Here, the server disclosed in the '389 Patent Claims performs three general functions: "receiving" information, "transmitting" information, and "forming" information. It is well-settled that "receiving" and "transmitting" functions are conventional activities. *See Alice*, 134 S. Ct. at 2355. The only arguably inventive concept is "forming" of "first information." However, the '389 Patent Claims do not chronicle *how* the "forming" is performed or even indicate that the "first information" is anything more than the pre-existing input information, i.e., "at least a portion of the mail transport protocol dialog and the indication of the receipt of the message by the recipient." '389 Patent, col. 28 ll. 1–3.[23] As stated above, mere information—even information formed from "verifiable information" as RPost contends—is not patentable. *See Digitech*, 758 F.3d at 1350. Consequently, no inventive concept has been added by the claims.

### iii.   Conclusion

For the foregoing reasons, the Court finds that the '389 Patent Claims are directed to the abstract idea of collecting and providing information about the receipt of a message and fail to add an inventive concept sufficient to confer eligibility. Accordingly, the Court will grant GoDaddy's motion for summary judgment on this issue and declare that '389 Patent Claim Nos. 1, 7, 12, 14, and 15 are invalid under § 101.

---

[23] Contrary to RPost's argument, the PTAB did not "find" or "recognize" that the "forming" step of the '389 Patent was a "technical feature that solves a technical problem." (Doc. 299 at 18–19). Instead, the PTAB merely determined that the petitioner failed to meet its burden of proof to institute a CBM patent review. (Doc. 304-4 at 9–10).

e.     **'199 Patent**[24]

The '199 Patent, a continuation of the '389 Patent, claims a method of providing information that an electronic message sent from a sender to a recipient through a server failed to be delivered. '199 Patent, col. 27 ll. 58–col. 28 ll. 15. To accomplish this objective, the '199 Patent Claims recite the same components and processes as the '389 Patent Claims, i.e., a server receives a portion of a mail transport protocol dialog generated by the transmission of the message from the server to the recipient and an indication from the recipient and then "form[s]" a "first information" from that data and "transmit[s]" it to the sender. *Id.* at col. 27 ll. 58–col. 28 ll. 7. The lone distinction between the '199 and '389 Patent Claims is that the "indication" received by the '199 Patent server indicates the failure of message delivery. *Id.* at col. 27 ll. 66–67. In full, the '199 Patent Claims recite as follows:

> **1**. A method of transmitting a message from a sender to a recipient through a server displaced from the recipient, the steps at the server comprising:
> receiving the message at the server from the sender;
> transmitting the message to the recipient;
> receiving at the server at least a portion of a data transport protocol dialog generated during transmission of the message from the server to the recipient; and
> receiving at the server from the recipient an indication of the failure to deliver the message to the recipient;
> forming at the server a first information from the at least a portion of the data transport protocol dialog and the indication of the failure to deliver the message by the recipient; and
> transmitting, before any authentication of the message, a copy of the first information to the sender from the server.
>
> **2**. The method of claim **1**, wherein the copy of the first information is stored in a memory in communication with the server.

---

[24] The asserted '199 Patent claims are Claim Nos. 1, 2, and 3. *See* (Docs. 258 at 2; 271-5 at 2; 300 at 2). These claims will be referenced as the "'199 Patent Claims."

**3**. The method of claim **1**, wherein transmitting, before any authentication of the message, includes transmitting a copy of the message and the first information to the sender from the server.

'199 Patent, col. 27 ll. 58–col. 28 ll. 14.

### i.      Step One: Patent-Ineligible Concept

Like the asserted claims of its parent application, the Court finds that the '199 Patent Claims are directed to an abstract idea, namely, collecting and providing information that a message was not delivered. The problem purportedly solved by the '199 Patent Claims long permeated the pre-Internet, analog world, while the concept of providing information that an electronic message failed to be delivered has been implemented by standard SMTP "bounce" code for dozens of years. *See* (Docs. 258 at 8; 271-11 at 6; 300 at 7). Moreover, the concept of collecting and providing information that a message was not delivered is similar to other concepts found by the Federal Circuit to be directed to abstract ideas. *See CyberSource*, 654 F.3d at 1370 (finding that "collection and organization of data" is directed to abstract idea); *Content Extraction*, 776 F.3d at 1347–48 (finding that "collecting data," "recognizing certain data within the collected data set," and "storing the recognized data in memory" were directed to a patent-ineligible concept). Consequently, the Court finds that the '199 Patent Claims are drawn to an abstract idea.

### ii.      Step Two: Inventive Concept

Like its parent application, at the heart of '199 Patent Claims is a method "for which computers are invoked merely as a tool." *Enfish*, 2016 WL 2756255, at *5. There is nothing new about the concept of providing information that a message was not delivered—generic SMTP code has performed this feat for decades. *See* (Docs. 258 at 8; 271-11 at 6; 300 at 7). Further, as a continuation of the '389 Patent, the '199 Patent Claims merely recite the same conventional steps, e.g., "transmitting," "receiving," and "forming," that are implemented by generic components, e.g., a "server," a "sender," and a "recipient," that decidedly do not add an inventive concept to the claims. *See, e.g.*, *Ultramercial*, 772 F.3d at 717 ("[A]dding a computer to otherwise conventional steps

- 48 -

does not make an invention patent-eligible."); *Intellectual Ventures I*, 792 F.3d at 1368 ("Instructing one to 'apply' an abstract idea and reciting no more than generic computer elements performing generic computer tasks does not make an abstract idea patent-eligible." (quoting *Alice*, 134 S. Ct. at 2359–60)). Accordingly, the Court concludes that no inventive concept has been added to the '199 Patent Claims sufficient to transform the abstract idea into a patent-eligible application.

### iii.   Conclusion

For these reasons, the Court finds that the '199 Patent Claims are directed to the abstract idea of collecting and providing information that a message was not delivered and failed to add an inventive concept sufficient to confer eligibility. The Court will therefore grant GoDaddy's motion for summary judgment on this issue and declare that '199 Patent Claim Nos. 1, 2, and 3 are invalid under § 101.

### B.   Conclusion for Patent-Eligibility

For the foregoing reasons, the Court concludes that all asserted claims of the Feldbau and Tomkow Patents are ineligible and invalid under § 101.[25] The remainder of GoDaddy's motion for summary judgment will therefore be deemed moot.[26]

## IV.   RPost's Motion for Summary Judgment

RPost moves the Court for summary judgment on Count I of GoDaddy's FAC. (Doc. 284). In Count I, GoDaddy asserts that during the parties' pre-suit discussions,

---

[25] On June 3, 2016, Judge Denise J. Casper of the United States District Court for the District of Massachusetts ruled on a motion for judgment on the pleadings in a similar case and held that the claims of the '389, '913, and '199 Patents are not directed to an abstract idea and claim an inventive concept. *See Sophos Inc. v. RPost Holdings, Inc.*, 2016 U.S. Dist. LEXIS 72699 (D. Mass. June 3, 2016). The Court has considered Judge Casper's order and gives it "weight," *see, e.g.*, *Stevenson v. Sears, Roebuck & Co.*, 713 F.2d 705, 711 (Fed. Cir. 1983); *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 723 (Fed. Cir. 1990), but "reach[es] a contrary legal conclusion" after exercising due "caution," *see Mendenhall v. Cederapids, Inc.*, 5 F.3d 1557, 1569 (Fed. Cir. 1993).

[26] As the Federal Circuit stated, "[t]he claim being invalid there is nothing to be infringed." *Richdel, Inc. v. Sunspool Corp.*, 714 F.2d 1573, 1580 (Fed. Cir. 1983).

RPost fraudulently misrepresented that it had "unrestricted rights" to enforce the Asserted Patents in lieu of disclosing that the patents' title was "clouded." (Doc. 46 at 12–17). Specifically, GoDaddy complains that RPost did not inform GoDaddy about litigation in California and Texas that "clouded" ownership of the Asserted Patents. (*Id.* at 13).

In its motion for summary judgment, RPost contends that there is no disputed issue of material fact as to whether it fraudulently misrepresented its patent ownership during pre-suit discussions with GoDaddy. *See* (Doc. 284). RPost argues that GoDaddy failed to present any evidence that RPost lacked the legal right to enforce the Asserted Patents and therefore cannot be liable for not disclosing "clouded" title. (*Id.* at 13). RPost also maintains that GoDaddy had knowledge of the California and Texas lawsuits via discussions with RPost representatives and access to public records. (*Id.*) RPost finally contends that Count I suffers from two pleading errors, namely, that "omissions" cannot form the basis for a fraudulent misrepresentation claim under Arizona law and that GoDaddy failed to plead a necessary element of fraudulent misrepresentation. (*Id.* at 7).

In response, GoDaddy argues that a disputed issue of material fact exists as to whether title to the Asserted Patents is "clouded." (Doc. 298). In GoDaddy's view, if there is a "cloud" on a patent's title, the patent owner must disclose that fact to an alleged infringer. (*Id.*) To that end, GoDaddy insists that there is a disputed issue of material fact as to whether RPost fraudulently misrepresented that it possessed "unrestricted title" to the Asserted Patents when a "cloud" on that title existed. (*Id.*)

### A.   Background

The ownership of the Asserted Patents has been detailed by the Court as follows:

> Starting in 1999, Dr. Terrance Tomkow applied for the [Asserted Patents], which describe a way of tracking and confirming delivery of email. (Doc. 46 at 6). Kenneth Barton and Zafar Khan joined Tomkow in creating a corporate structure to protect this intellectual property and founded RPost International and a related organization called RPost, Inc. (*Id.*) Tomkow, Barton, and Khan were all shareholders in RPost International. (*Id.*) On September 13, 2000, Dr. Tomkow assigned his patent applications to RPost International, and the three principals unsuccessfully pursued funding to commercialize the intellectual property

owned by RPost International. (*Id.*)

Barton's relationship with Tomkow and Khan fell apart over time, and Barton eventually brought two actions against Tomkow and Khan (the "Barton Cases"). (*Id.*) First, on August 3, 2012, a California court found that Tomkow, Khan, and RPost International had acted with malice, oppression, and fraud when they converted Barton's RPost International shares. (*Id.* at 7). Tomkow, Khan, and RPost International were ordered to restore Barton's shares and to pay punitive and general damages. (*Id.*) Second, Barton brought another state action against RPost International, RMail, and RComm alleging that RPost International, Tomkow, and Khan fraudulently transferred corporate assets, including intellectual property assets, of RPost International to RComm and RMail. (*Id.*) Barton alleges that Tomkow and Khan formed the new off-shore entity, RMail, and then as officers of both RPost International and RMail, caused $750,000 to be transferred from RPost International to RMail. (*Id.* at 8). RMail used that money to purchase RPost International's intellectual property assets, including the [Asserted Patents]. (*Id.*) RPost International then paid $200,000 to RMail as a license fee for the use of those same intellectual property assets. (*Id.*) Barton did not approve or sign any of these property transfers. (*Id.* at 9). RPost has tried to exploit the [Asserted Patents] since these transfers have occurred. (*Id.*)

Khan and Tomkow have each filed for bankruptcy under Chapter 13 (the "Bankruptcy Cases"), but Barton has objected to the bankruptcy filings for various reasons. (*Id.*) In December 2013, the bankruptcy court granted Barton's motions to convert Khan and Tomkow's Chapter 13 Bankruptcy Cases to Chapter 7 and appointed a trustee to manage their assets, including the [Asserted Patents]. (*Id.*)

RPost has filed lawsuits against several of GoDaddy's competitors alleging infringement of the Patents-in-Suit, which have been consolidated into one action called *Rmail Ltd. v. Amazon.com, Inc.*, No. 2:10-cv-258-JRG in the Eastern District of Texas (the "*Amazon* Case"), filed August 24, 2012. (*Id.* at 10–11). Just before trial, one defendant in the *Amazon* Case received correspondence from the plaintiff in the Barton Cases advising that there should be no settlement or disposition in actions involving the Patents-in-Suit until their ownership has been determined. (*Id.* at 11). In light of this correspondence, on January 30, 2014, the judge in the Eastern District of Texas stayed and administratively closed the *Amazon* Case pending resolution of the patent ownership disputes. (*Id.* at 11).

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 6908507, at *1–2 (D. Ariz. Dec. 9, 2014); (Doc. 105 at 2–3). The Court has also described the party's pre-suit discussions as follows:

RPost first contacted GoDaddy via email on July 17, 2013 ("the Email") and advised of its belief that GoDaddy was infringing [the Asserted Patents]. (Doc. 46-4). RPost alleged in the Email that GoDaddy's "business processes and electronic messaging and document operations" infringed RPost's patents. (Doc. 46-4 at 3). The Email also suggested that GoDaddy "review the RPost patents noted below for a more complete description of RPost patented technologies and review these in the context of your technology operations." (*Id.*) The Email then listed seventeen patents owned by RPost including the Tomkow Patents, RMail Patents, and others, with no attention drawn to any particular patent in the list. (*Id.* at 3–4).

In a letter on October 4, 2013 ("the Letter"), RPost further asserted the Tomkow Patents by providing claim charts "identifying certain claims of certain patents and [GoDaddy's] infringing conduct." (Doc. 46-5 at 4). RPost brought specific attention to GoDaddy's "Express Email Marketing" product and service. (*Id.*) Only claims from the Tomkow Patents were analyzed, but RPost advised GoDaddy that "[i]t is likely that [GoDaddy's] products and services are infringing other claims of RPost's patents." (*Id.*) RPost provided a comprehensive list of patents owned by RPost at the end of the Letter, which included foreign and U.S. patents, the Tomkow Patents, RMail Patents, and pending patent applications, with no attention drawn to any specific patent.

On October 22, 2013, an RPost representative named Jerry Silver called GoDaddy's Associate General Counsel for Intellectual Property, Karl Fazio, telephonically to discuss the Email and the Letter ("the Phone Call"). (Doc. 84-2 at 3). Silver accused GoDaddy of infringing RPost's patents and brought up RPost's past litigation, indicating that RPost is not afraid to litigate in order to enforce its patents. (*Id.* at 4). Silver and Fazio discussed RPost's patents, but GoDaddy has provided no evidence that any specific patents were discussed in detail. (*See id.* at 3–4; doc. 84 at 3–4).

Finally, on or about November 19, 2013, RPost sent GoDaddy a PowerPoint presentation ("the Presentation") entitled "Summary of Preliminary Infringement Analysis." (Doc. 84 at 4). On the cover page of the Presentation, four of the Tomkow Patents were listed under a heading entitled "Patents & Claims in Analysis," and the '219 patent (an RMail Patent), along with one Tomkow Patent and three other patents, was listed under a heading entitled "Additional Recommended Review." (Doc. 84-2 at 10). On the next slide of the Presentation, there was a list of many patents owned by RPost with no attention drawn to any particular patent. (Doc. 84-2 at 11).

*GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 6908520, at *1–2 (D. Ariz. Dec.

9, 2014); (Doc. 107 at 2–3).

## B.      Fraudulent Misrepresentation

In order to establish a fraudulent misrepresentation claim under Arizona law, a claimant must show: "1) a representation; 2) its falsity; 3) its materiality; 4) the speaker's knowledge of the representation's falsity or ignorance of its truth; 5) the speaker's intent that it be acted upon by the recipient in the manner reasonably contemplated; 6) the hearer's ignorance of its falsity; 7) the hearer's reliance on its truth; 8) the right to rely on it; and 9) his consequent and proximate injury." *Echols v. Beauty Built Homes*, 647 P.2d 629, 631 (Ariz. 1982).

Because RPost also raises a pleading deficiency in addition to seeking summary judgment, the Court notes that certain elements of fraud claims carry a higher standard of pleading under the Federal Rules of Civil Procedure ("Rules"). Namely, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of the mind of a person may be averred generally." Fed. R. Civ. P. 9(b). "To allege fraud with particularity, a [claimant] . . . must set forth an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994). "While statements of the time, place and nature of the alleged fraudulent activities are sufficient, mere conclusory allegations of fraud are insufficient." *Moore v. Kayport Package Exp., Inc.*, 885 F.2d 531, 540 (9th Cir. 1989).

## C.      Analysis

In Count I of its FAC, GoDaddy contends that because RPost's ownership of the Asserted Patents was called into question by the Barton and Bankruptcy Cases, RPost is liable for fraudulently misrepresenting that it possessed "unclouded ownership in and rights to enforce" the Asserted Patents. *See* (Doc. 46 at 16). In other words, GoDaddy seeks to recover damages not because it believes (or has any evidence that) RPost does not have the legal right to enforce the Asserted Patents, but because RPost did not inform GoDaddy that a "cloud" shadows the patents' title.

To begin, the Court questions the propriety of RPost challenging the adequacy of GoDaddy's pleading via a motion for summary judgment where it is the movant's burden to either set forth evidence proving that it is entitled to judgment as a matter of law or show that the non-movant cannot establish all necessary elements of its claim. Nonetheless, RPost argues that "[n]on-disclosure cannot form the basis of an Arizona-based fraudulent misrepresentation claim because those are well-recognized as separate torts under the Arizona common law." (Doc. 315 at 7) (citing *Resort Funding, L.L.C. v. Canyonview Dev., L.P.*, 2012 WL 3760440, at *9 (Ariz. Ct. App. Aug. 30, 2012)). Although it is true that Arizona distinguishes between tort claims for fraudulent misrepresentation, fraudulent concealment, and non-disclosure, *see Wells Fargo Bank v. Ariz. Laborers Local No. 395 Pension Trust Fund*, 38 P.3d 12, 34–36 (2002), Count I of GoDaddy's FAC claims that RPost affirmatively misrepresented that it possessed "unclouded ownership in and rights to enforce" the Asserted Patents while failing to disclose the pending California and Texas actions, (Doc. 46 at 16). Because Count I alleges that RPost affirmatively represented a particular fact that was false, the Court finds that Count I falls within the contours of a claim for fraudulent misrepresentation. *See Wells Fargo Bank*, 38 P.3d at 34 ("Where failure to disclose a material fact is calculated to induce a false belief, 'the distinction between concealment and affirmative misrepresentation is tenuous.'" (quoting *Schock v. Jacka*, 460 P.2d 185, 187 (Ariz. 1969))).[27]

_____

[27] The Court also rejects RPost's argument that Count I suffers from a pleading deficiency because GoDaddy did not plead its ignorance of the falsity of RPost's representations. Although GoDaddy did not plead that it lacked knowledge of the falsity of RPost's representations in a separate number, the Rules permit a party to plead this element "generally." *See* Fed. R. Civ. P. 9(b). In this regard, Count I incorporates assertions that generally and plausibly allege that GoDaddy lacked knowledge of the purported falsity of RPost's representations. Namely, Count I claims that GoDaddy "reasonably relied to its detriment" on RPost's representations. (Doc. 46 at 17). Under Arizona law, one cannot "reasonably rely" on information that is false. *See Fectay v. Tahiri*, 2015 WL 7710272, at *2 (Ariz. Ct. App. Nov. 30, 2015). Thus, by pleading that it "reasonably relied" on RPost's representations, GoDaddy "generally" pled that it lacked

Despite overcoming RPost's pleading deficiency arguments, GoDaddy failed to establish that any of RPost's representations were, in fact, false. After substantial review of the parties' papers, the Court finds that GoDaddy has not articulated any disputed issue of material fact as to "why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d at 1548. The fundamental problem with Claim I is its underlying assumption that RPost had an obligation to inform GoDaddy about the alleged "cloud" on the Asserted Patents' title. *See* (Doc. 46 at 16).[28] GoDaddy, however, advanced no evidence or binding authority demonstrating that "free and clear" ownership is necessary to *assert* a patent. The lone case cited by GoDaddy in this regard is an unpublished decision from the Southern District of New York that insignificantly remarks that "people do not ordinarily pay lawyers to bring lawsuits to enforce patents that they do not own." *Advanced Video Techs. LLC v. HTC Corp.*, 2015 WL 7621483, at *11 (S.D.N.Y. Aug. 28, 2015). Only through a particularly pretentious reading of this statement could a reader smoke out any indication that a patent owner must inform an alleged infringer about a "cloud" on the patent's title, let alone arrive at the conclusion that a patent owner must own its patent "free and clear" to assert it.[29]

In any event, GoDaddy's belief that RPost must have had "free and clear" title in

---

knowledge of the representation's alleged falsity.

[28] The half-page of footnotes in GoDaddy's brief explaining the "clouded title" doctrine all relate to the *sale* of *real property*. *See* (Doc. 298 at 6). In contrast, the provision of the Patent Act describing patent ownership states that "patents shall have the attributes of *personal property*." 35 U.S.C. § 261 (emphasis added). The only case GoDaddy cites to support its conclusory theory that "[t]he clouded or defective title doctrine, though typically arising in real property, applies with equal force to titles of patents" is a 114 year-old case issuing from the D.C. Circuit. *See* (Doc. 298 at 6) (citing *Columbia Nat'l Sand Dredging Co. v. Miller*, 20 App. D.C. 245, 252 (D.C. Cir. 1902)). In any event, GoDaddy cites no authority to establish that *asserting* a patent (personal property) against an alleged infringer is akin to the *sale* of real property.

[29] GoDaddy also cites Rule 11 to support its argument that a patent must be owned "free and clear" in order to be enforced. (Doc. 298 at 5). Rule 11, however, deals with pleadings made to a court of law and certainly has no bearing on whether a patent must be owned "free and clear" to be asserted before litigation. *See* Fed. R. Civ. P. 11(b).

order to assert its patents against GoDaddy in pre-litigation discussions is not required under the law. Rather, the question of patent ownership focuses on whether RPost had "legal title" to enforce the patents. *See, e.g.*, *MyMail, Ltd. v. Am. Online, Inc.*, 476 F.3d 1372, 1375–76 (Fed. Cir. 2007) ("A plaintiff must demonstrate legal title to the patent at the inception of the lawsuit to be entitled to sue for patent infringement."); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) ("[O]ne seeking to recover money damages for infringement of a United States patent (an action 'at law') must have held the legal title to the patent during the time of the infringement." (citing *Crown Die & Tool Co. v. Nye Tool & Mach. Works*, 261 U.S. 24, 40–41 (1923))); *Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1309 (Fed. Cir. 2003) ("[I]n order to assert standing for patent infringement, the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit.").

Consequently, as the party alleging fraudulent misrepresentation of patent ownership, GoDaddy bears the burden of proving that RPost lacked "legal title" to the Asserted Patents at the time of the representations. In this regard, GoDaddy failed to provide any evidence showing that RPost did not have "legal title" to the patents, and no court has determined otherwise.[30] Alleged clouded title to a patent does not mean that the patent owner lacks legal title to assert that patent. *See Arachnid*, 939 F.2d at 1577–82 (holding that although a third-party's legal title to the asserted patent was questioned by a challenger's equitable title at the time of the alleged infringement, only the legal title-holder had the right to sue for money damages).[31]  Because GoDaddy "fail[ed] to make a

---

[30] The Court explained this concept in its prior Order dismissing Counts III–XII of GoDaddy's FAC against certain RPost-affiliated entities. *See GoDaddy.com, LLC v. RPost Commc'ns Ltd.*, 2014 WL 7263537, at *6 (D. Ariz. Dec. 9, 2014); (Doc. 106 at 9). Specifically, the Court identified that the "legitimacy of the assignment of the Tomkow Patents . . . is not the present issue before the Court, nor has that assignment been deemed fraudulent by any court to date." *Id.*

[31] Again, the singular case cited by GoDaddy to argue that RPost should be liable for fraudulently misrepresenting "unrestricted patent infringement litigation rights" is untenable. *See* (Doc. 298 at 13) (citing *Intamin, Ltd. v. Magnetar Techs. Corp.*, 623 F.

showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial," *Celotex*, 477 U.S. at 322, summary judgment in favor of RPost is appropriate.

Moreover, to prevail on a claim for fraudulent misrepresentation, GoDaddy must show that RPost made a misrepresentation of *fact*. *See Wells Fargo Bank*, 38 P.3d at 34 n.22. In several instances, GoDaddy conflates representations of fact with representations of opinion. For example, GoDaddy asserts that Mr. Khan fraudulently termed RPost's ongoing litigation in California and Texas as "nothing to worry about" and "frivolous." (Doc. 308-1 at 189). These assertions, however, were certainly not representations of *fact*, but were Mr. Khan's *opinions* that the ongoing cases concern unproven allegations—which, to this day, still do. Whether GoDaddy relied on these statements is inconsequential to the inquiry of whether the representations were of *fact*, an element of fraud to which GoDaddy bears the burden of proof. *See Caruthers v. Underhill*, 287 P.3d 807, 816 (Ariz. Ct. App. 2012) ("Expressions of opinion are not material facts sufficient to support a claim of fraud." (citation omitted)).

Finally, even assuming a "cloud" covered RPost's title to the Asserted Patents and RPost's representations of "unclouded ownership" were false, GoDaddy failed to present evidence that the representations were "material." Namely, even if a "cloud" existed, that does not mean RPost did not have the legal right to enforce the patents, *see Arachnid*, 939 F.2d at 1577–82, and GoDaddy provided no evidence proving that RPost did not possess legal title to the patents at the time of the representations. Without such evidence, RPost's

---

Supp. 2d 1055 (C.D. Cal. 2009)). In *Intamin*, the court determined that a patentee "misrepresent[ed] . . . its ownership interest in the patent" pursuant to the unclean hands doctrine when it sent a demand letter to an alleged infringer but *did not own* the patent. 623 F. Supp. 2d at 1072, 1077–78. In this case, the doctrine of unclean hands is not at issue, and, more importantly, GoDaddy has set forth no evidence that RPost does not own the Asserted Patents. In fact, GoDaddy even appears to concede that RPost *currently* owns and has the right to enforce the patents. *See* (Doc. 298 at 10) ("A jury will see from these claims that they created a cloud on title to the RPost Patents, with the resulting material risk that RPost *would lose ownership of and the right to enforce the patents altogether* . . . ." (emphasis added)).

representation of "unclouded ownership" could not have been "material" for fraud.

**D.    Conclusion on RPost's Motion for Summary Judgment**

Accordingly, the Court finds that even if all justifiable inferences are construed in GoDaddy's favor, no disputed issue of material fact exists such that a reasonable jury could find RPost liable on Count I of the FAC. GoDaddy failed to set forth any evidence that RPost's representations of legal title to the Asserted Patents were materially false even assuming the title was "clouded." Simply because a third party makes a claim to a patent's title does not mean the patent owner simultaneously forfeits its legal right to enforce the patent. Thus, the Court will grant RPost's motion for summary judgment.

**V.    Conclusion**

Based on the foregoing,

**IT IS ORDERED** that GoDaddy's Motion for Summary Judgment (Doc. 257) is **GRANTED** and the Court **DECLARES** as follows:

- The asserted claims of the '219 Patent, Claim Nos. 60, 62, 66, and 69, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '913 Patent, Claim Nos. 1 and 2, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '104 Patent, Claim Nos. 1, 9, 27, and 32, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '198 Patent, Claim Nos. 1, 6, 7, 10, 18, 23, 32, and 35, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '199 Patent, Claim Nos. 1, 2, and 3, are **INVALID** under 35 U.S.C. § 101.

- The asserted claims of the '389 Patent, Claim Nos. 1, 7, 12, 14, and 15, are **INVALID** under 35 U.S.C. § 101.

- The remainder of GoDaddy's motion for summary judgment and the remaining Counts seeking declarations in GoDaddy's First Amended

1    Complaint are deemed moot.[32]

2    **IT IS FURTHER ORDERED** that RPost's Motion for Summary Judgment on

3    Plaintiff's Count I (Fraudulent Misrepresentation of Patent Ownership) (Doc. 284) is

4    **GRANTED**.

5    **IT IS FURTHER ORDERED** that the jury trial set for August 22, 2016 is

6    **VACATED**.

7    **IT IS FINALLY ORDERED** that the Clerk of Court shall enter judgment in this

8    case with prejudice in favor of Plaintiff and against Defendants on Counts VIII–XIII and

9    XV of the First Amended Complaint.[33] Counts III–VII are **DISMISSED** without

10   prejudice as moot, Plaintiff shall take nothing on these Counts and the Clerk of Court

11   shall enter judgment accordingly on these Counts. The Clerk of Court shall enter

12   judgment in favor of Defendants and against Plaintiff on Count I of the First Amended

---

[32] RPost's original infringement contentions included several claims that RPost decided to withdraw after the Court's *Markman* Order. *See* (Docs. 258 at 2, 12; 300 at 2, 10). These originally-asserted but withdrawn claims are as follows: '198 Patent Claim No. 40; '199 Patent Claim No. 7; '389 Patent Claim Nos. 5 and 13; and '219 Patent Claim Nos. 82, 86, and 88. *See* (Docs. 191-1 at 1, 10; 258 at 2, 12; 271-5 at 2; 300 at 2, 10). In its statement of facts, GoDaddy stated that the currently-asserted claims are as follows: '219 Patent Claim Nos. 60, 62, 66, and 69; '199 Patent Claim Nos. 1, 2, and 3; '198 Patent Claim Nos. 1, 6, 7, 10, 18, 23, 32, and 35; '389 Patent Claim Nos. 1, 7, 12, 14, and 15; '913 Patent Claim Nos. 1 and 2; and '104 Patent Claim Nos. 1, 9, 27, and 32. (Doc. 258 at 2, 12). In support, GoDaddy attached an e-mail from RPost's counsel dated February 24, 2016, confirming these claims. *See* (Doc. 271-5 at 2). RPost did not dispute these statements of fact or the e-mail. (Doc. 300 at 2, 10). Consequently, the Court will treat the statements of fact as true, *see* Fed. R. Civ. P. 56(e)(2), and, because GoDaddy moved for summary judgment on all currently-asserted claims, no claims remain pending before the Court. Finally, GoDaddy's First Amended Complaint requested a declaration of invalidity of "each of the Patents-in-Suit." (Doc. 46 at 38). To be clear, the Court does not declare the entirety of each Asserted Patent to be invalid; rather, the Court holds and declares invalid the currently-asserted claims expressly listed as invalid.

[33] Because the Counts on which Plaintiff prevailed seek only a declaration, Plaintiff is not awarded any monetary damages. Plaintiff, should it so desire, may move for an award of attorneys' fees, consistent with the Federal and Local Rules, pursuant to 35 U.S.C. § 285.

Complaint. This judgment addresses the entire First Amended Complaint, (Doc. 46).[34] Due to the Declarations stated above, Defendants' Counterclaims, (Doc. 108), are **DISMISSED** in their entirety without prejudice, and the Clerk of Court shall enter judgment accordingly on the Counterclaims.

Dated this 7th day of June, 2016.

_James A. Teilborg_
Senior United States District Judge

---

[34] Counts II, XIV, and XVI of the First Amended Complaint were dismissed by prior Orders. *See* (Docs. 105, 107). The Court also notes that the First Amended Complaint seeks injunctive relief. *See* (Doc. 46 at 38). However, in moving for summary judgment (as opposed to partial summary judgment), Plaintiff failed to mention injunctive relief. Accordingly, the Court deems any such request to be waived. *See* Fed. R. Civ. P. 56(a) advisory committee's note to 2010 amendment (explaining "that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense" and that "'partial summary judgment' . . . describe[s] disposition of less than the whole action"); *see generally Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 (9th Cir. 2005) (observing that party "abandoned" two claims plead in complaint "by not raising them in opposition to the [defendant]'s motion for summary judgment").